IN RE INTEREST OF J.B. AND A.P., CHILDREN UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE, V. G.P., APPELLANT.
453 N.W.2d 477

Filed April 6, 1990.    No. 89-794.

Donald W. Kleine, of Kleine Law Office, for appellant.

Ronald L. Staskiewicz, Douglas County Attorney, and Elizabeth G. Crnkovich for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

FAHRNBRUCH, J.

G.P.'s parental rights to her two surviving children, J.B. and A.P., were terminated because she substantially and continuously or repeatedly neglected the children and refused to give them necessary parental care and protection. G.P. appeals. We affirm.

The evidence before the Douglas County Separate Juvenile Court reflects that T.P., a male with whom G.P. was living, repeatedly, over a period of time, had brutally attacked G.P.'s two sons, 18-month-old C.B. and 4-year-old J.B. C.B. died due to head injuries as a result of T.P.'s last attack. J.B. repeatedly suffered severe injuries inflicted by T.P. No medical attention had been provided for either child until C.B. became comatose. Even then, J.B. received no medical attention for his injuries until police officers intervened.

The record reflects that after C.B. was hospitalized, both T.P. and G.P. were arrested because of their conduct in regard to one or more of G.P.'s children. The record also reflects that at the time of the juvenile court hearing, nearly a year after C.B. died, G.P. was serving a sentence in the Nebraska Center for Women at York. She expected to be discharged in September 1989.

The trial court's order of June 21, 1989, terminated G.P.'s parental rights in J.B. It also terminated T.P.'s and G.P.'s parental rights in A.P., the couple's then 13-month-old daughter. The natural father of J.B. was not before the court. T.P. did not appeal the termination order as it applied to him.

Therefore, only the termination of parental rights of the natural mother, G.P., in J.B. and A.P. will be considered.

In her single assignment of error, G.P. alleges that the juvenile court erred in finding that there was clear and convincing evidence that it was in her children's best interests to terminate their mother's parental rights. G.P. has never challenged the juvenile court's adjudication that it had jurisdiction of J.B. and A.P. under Neb. Rev. Stat. § 43-247 (Reissue 1988), which provides: "The juvenile court in each county as herein provided shall have jurisdiction of . . . (3) Any juvenile (a) . . . who is in a situation . . . dangerous to life or limb or injurious to the health or morals of such juvenile . . . ."

The petition in this case charged, and the juvenile judge found by clear and convincing evidence, that G.P.'s parental rights in J.B. and A.P. should be terminated under Neb. Rev. Stat. § 43-292(2) (Reissue 1988) because G.P. substantially and continuously or repeatedly neglected J.B. and A.P. and refused to give said children necessary parental care and protection. Section 43-292 provides:

> The [juvenile] court may terminate all parental rights between the parents . . . and such juvenile when the court finds such action to be in the best interests of the juvenile and it appears by the evidence that one or more of the following conditions exist:
>
> . . . .
>
> (2) The parents have substantially and continuously or repeatedly neglected the juvenile and refused to give the juvenile necessary parental care and protection . . . .

In an appeal from a judgment terminating parental rights, the Nebraska Supreme Court tries the factual questions de novo on the record, which requires the court to reach a conclusion independent of the trial court. *In re Interest of N.L.B.*, 234 Neb. 280, 450 N.W.2d 676 (1990). However, when the evidence is in conflict, the Supreme Court considers and may give weight to the trial court's observation of the witnesses and acceptance of one version of the facts rather than another. *Id.*

An order terminating parental rights must be based on clear and convincing evidence. *In re Interest of E.R., J.R., and A.R.*, 230 Neb. 646, 432 N.W.2d 834 (1988). " '[C]lear and

convincing means and is that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved.' " *In re Interest of J.S., A.C., and C.S.*, 227 Neb. 251, 266, 417 N.W.2d 147, 157 (1987). The right of parents to maintain custody of their child is a natural right, subject only to the paramount interests which the public has in the protection of the rights of the child. *In re Interest of M.*, 215 Neb. 383, 338 N.W.2d 764 (1983). A parent's natural right to the custody of his or her own child must yield when the two requirements of § 43-292 have been met. *In re Interest of J.S., A.C., and C.S., supra.* First, there must be clear and convincing evidence of the existence of one or more of the circumstances described in subsections (1) to (6) of § 43-292. Second, if one of the conditions prescribed in subsections (1) to (6) has been evidentially established, there must be an additional showing by clear and convincing evidence that termination of parental rights is in a child's best interests. *In re Interest of J.S., A.C., and C.S., supra.* "It is a combination of the best interests of the child and evidence of fault or neglect on the part of the parents that is required." *In re Interest of M.B., R.P., and J.P.*, 222 Neb. 757, 766, 386 N.W.2d 877, 883 (1986).

A parent's failure to take proper measures to protect children from abuse by another furnishes sufficient cause to terminate parental rights under the statutory subsection at issue. See, *In re Interest of Hollenbeck*, 212 Neb. 253, 322 N.W.2d 635 (1982); *In re Interest of Cook*, 208 Neb. 549, 304 N.W.2d 390 (1981).

With the foregoing legal principles as guidelines, we review the record de novo to determine if the evidence is clear and convincing to justify terminating G.P.'s parental rights to her two surviving children.

The evidence is in conflict as to whether G.P. and T.P. were married on December 12, 1987, as reported to a police officer. There is an indication that a marriage license was issued for G.P. and T.P. to marry. There is also some evidence that the marriage license was used and a marriage ceremony performed. However, G.P. maintains that she was not present at any marriage ceremony and, therefore, T.P. and she are not husband and wife. Nevertheless, G.P. lived with T.P. and used his surname.

Residing in the home with T.P. and G.P., as of late May 1988, were T.P.'s 4-year-old daughter, C.P.; J.B.; C.B.; and A.P., who was about 3 weeks old. C.P. was born out of wedlock to T.P. and a woman with whom he had lived some time prior to April 1987. J.B. and C.B. were fathered by men other than T.P.

In May 1988, T.P. and G.P. took 18-month-old C.B., in a comatose and unresponsive condition, to the Bergan Mercy Hospital emergency room in Omaha. C.B. was then transferred to Childrens Memorial Hospital's pediatric intensive care unit. The youngster was bleeding inside the skull, which created pressure on the brain; he had a number of fractures, some of which were old and in the process of healing while others were of more recent origin, and a number of bruises, several of which were older. The boy's condition was considered life threatening and critical. His injuries occurred the day before he was taken to Bergan Mercy. Approximately 2 weeks later, C.B. died from his head injuries.

After C.B. was taken to the hospital and examined, a police investigation ensued. Police, after first being misdirected by G.P. and T.P., later found J.B.; J.B.'s 3-week-old half sister, A.P.; and T.P.'s 4-year-old daughter, C.P., in their home. The three children were discovered fully clothed, sleeping near a soiled diaper on an unmade bed. T.P., fully clothed, was hiding in the shower. A babysitter was also found in the home. The home was extremely filthy, smelled of urine, and was littered with clothing, debris, cat feces, and discarded food. The condition of the home was unwholesome and unsafe for the children. The children were taken to University Hospital in Omaha for examination.

The extent of J.B.'s injuries is not contested. He had numerous bruises and excoriated areas which were tender to the touch; swelling about the head; inflamed eardrums; a fracture of the jaw in two places, which prevented him from opening his mouth beyond 13 millimeters; a fracture of the right middle finger; a 2-week-old fracture of the tibia, the largest bone in the lower leg, that prevented J.B. from putting any weight on his left foot; a shattered left distal phalanx, a bone in the big toe; a fractured collarbone; three rib fractures, which are unusual in children because of their resilient skeletal systems; and a

vertebral body compression fracture of the eighth thoracic vertebra.

The evidence is clear and convincing that many of the injuries to J.B. and C.B. were inflicted by T.P.'s hitting, kicking, and choking the boys. During the last episode of injuries, in the presence of G.P., T.P. hit and kicked both boys. He also choked C.B. and threw him at J.B. C.B. "didn't wake up," 4-year-old C.P. told an examining physician. She told a police sergeant that she had seen T.P. choke C.B. and throw him onto the floor underneath the baby crib. C.B., after he was thrown, kept vomiting, went to sleep, and was very sick, according to C.P.

The evidence of T.P.'s child abuse was not confined to G.P.'s children. Although no trauma was visible when C.P., the 4-year-old daughter of T.P., was examined at University Hospital, she told the police sergeant that her daddy "beat my ass." G.P. testified that T.P. had beaten C.P. with a belt when she wet her pants.

The evidence is clear and convincing that G.P. never took meaningful steps to protect the children in her household from T.P.'s abuse. As a matter of fact, she lied to protect T.P. when she told a police sergeant that C.B. was injured when he fell from a couch and hit his head on the floor, when she knew that T.P. had thrown the child at J.B. G.P. testified that she had "[a]ll the time" seen T.P. strike J.B. and C.B. and that T.P. had kicked them while he was wearing boots. G.P. told the police sergeant that she had seen T.P. hit the boys in the stomach with a closed fist and pick the children up by the neck and choke them. Despite her belief that J.B.'s leg was broken, G.P. did not seek medical attention for the child because she did not wish to go against T.P.'s wishes. Due to T.P.'s abuse to her sons, G.P. left T.P. sometime between October and early December 1987. Because he promised he would stop beating the children, G.P. returned and allegedly married T.P. on December 12, 1987. The beatings did not stop. There is clear and convincing evidence that some of the beatings the boys received were inflicted after December 12, 1987, but at a time well before C.B. was fatally attacked in May 1988. G.P. told the police sergeant that she could have prevented the abuse of her children by just picking up and leaving her husband. Even after C.B. was fatally

injured, G.P. had no interest in leaving T.P. because she loved him.

It is undisputed that on May 23, 1988, a pediatric examination of 3-week-old A.P. revealed that she was suffering from ear infections in both ears; congestion in the nose and throat; and thrush, a yeast infection on her tongue and lips. A.P. had had thrush for some period of time. It is readily observable, since the infection manifests itself in white spots. While these conditions may be considered somewhat minor, there was medical testimony that ear infections should be treated promptly. It is clear G.P. had provided A.P. no medical treatment for her maladies. It can be inferred from G.P.'s failure to obtain prompt medical attention for her children that had it not been for intervention by the police, A.P. would not have received medical attention. Fortunately, A.P.'s medical examination showed that she had suffered no traumatic injuries.

While A.P. had not suffered physical abuse at the hands of her father, it is not necessary that the court wait until the child shows permanent physical scars before the court can act to terminate parental rights. See *In re Interest of J.D.M.*, 230 Neb. 273, 430 N.W.2d 689 (1988). In this instance, the evidence is clear and convincing that G.P. failed to provide necessary care and protection for A.P. She did not provide prompt medical care for the child, nor did she remove the child from the hostile environment where children were beaten.

That G.P.'s conduct falls within § 43-292(2) is proven by clear and convincing evidence.

The evidence having clearly and convincingly established that G.P. substantially and continuously or repeatedly neglected her children and refused to give said children necessary parental care and protection, we now consider the best interests of G.P.'s two surviving children.

By her own admission, G.P. was present during the assaults on her children. Significantly, G.P. believed that J.B.'s leg was broken, but did not seek medical treatment for the child. See *In re Interest of A.L.G.*, 230 Neb. 732, 432 N.W.2d 852 (1988) (citing in support of its decision to uphold termination the mother's failure to seek medical treatment for 2 to 4 weeks after

her child suffered several fractures). Our decision is influenced not only by the severity of the abuse, but also by its duration. The record reflects that G.P. was aware of the abuse long before the late fall of 1987, when she and her children went to live in her parents' home. By returning to an abusive environment, she chose to satisfy her own desires despite the obvious endangerment to her children. There is some evidence that G.P. is mildly retarded and was abused by, and fearful of, her husband. She claims this prevented her from protecting her children or leaving with them. However, by her own admission, G.P. could have prevented the tragedy by picking up and leaving with the children. Even as her 18-month-old child lay comatose at the hospital, G.P. stated she would not leave her husband because she loved him.

G.P. contends that parental rights should not be terminated unless the parent is first provided the opportunity to rehabilitate himself or herself. There is no requirement that a court must implement a rehabilitation plan before parental rights may be terminated. *In re Interest of M.B., R.P., and J.P.*, 222 Neb. 757, 386 N.W.2d 877 (1986); *In re Interest of L.J., J.J., and J.N.J.*, 220 Neb. 102, 368 N.W.2d 474 (1985).

The clear and convincing evidence of G.P.'s neglect to obtain prompt medical attention for C.B., J.B., and A.P.; G.P.'s failure to protect C.B. and J.B. from T.P.'s brutal assaults; and G.P.'s failure to remove A.P. from a hostile environment leads to only one conclusion—that it is in the best interests of G.P.'s two surviving children that the natural mother's parental rights be terminated.

AFFIRMED.