STATE OF NEBRASKA, APPELLEE,
v. SYDNEY L. THIESZEN, APPELLANT.
560 N.W.2d 800

Filed March 28, 1997.   No. S-96-713.

James H. Truell, of Law Offices of James H. Truell, and Daniel E. Pullen, York County Public Defender, for appellant.

Don Stenberg, Attorney General, and Mark D. Starr for appellee.

WHITE, C.J., CAPORALE, WRIGHT, CONNOLLY, and GERRARD, JJ., and BOSLAUGH and GRANT, JJ., Retired.

CAPORALE, J.

## I. STATEMENT OF CASE

Pursuant to verdict, the defendant-appellant, Sydney L. Thieszen, was adjudged guilty of and sentenced for committing a first degree murder, in violation of Neb. Rev. Stat. § 28-303 (Reissue 1995), and for using a firearm in the commission of a felony, in violation of Neb. Rev. Stat. § 28-1205 (Reissue 1989). In challenging those convictions, Thieszen asserts, in summary, that the district court erred in (1) failing to suppress his statement to police, (2) failing to rule that the use of a firearm charge was barred by the statute of limitations, (3) excluding certain evidence and receiving certain other evidence, and (4) failing to direct a verdict against the plaintiff-appellee, State of Nebraska, on the murder charge. We affirm.

## II. BACKGROUND

Thieszen's parents had six children, three of whom were adopted. The adopted children include Thieszen, who was 14 years old on September 17, 1987, and his sister and victim, Sacha, who was then 12 years old.

After school on that day, Thieszen and the victim were left home together while the father and another son went to do some farm fieldwork. Because the mother had earlier left a note telling the father to punish Thieszen, he decided to run away from home. In preparation for doing so, he collected various items from the upstairs of the family home, including a .22-caliber revolver which another brother owned and kept in his locked room. Thieszen took the gun so he could "live off the land."

When Thieszen went back downstairs, he told the victim that he was running away; the victim threatened to call the police if he tried, and the two began arguing. According to Thieszen, it was at this time that he got the idea that he would have to stop the victim from calling the police by knocking her out with a wooden dowel. Within minutes of the argument while in the kitchen area of the house, Thieszen hit the victim on her head with the dowel.

Bleeding from her head, the victim left the kitchen and went upstairs to a bathroom. Thieszen testified that he followed the

victim up the stairs and that the next thing he remembered was the shot which "awakened" him and caused the victim to fall backward. To prevent a large amount of blood from getting on the carpet, he put the victim into the bathtub. After shooting her two more times, he left the farm in the family van.

A complaint and arrest warrant were lodged on September 18, 1987. On September 21, Thieszen was found sleeping in a post office in Salina, Kansas. Believing Thieszen to be a runaway, the Salina police took him and the missing family van into custody. Thieszen told the arresting officer that he was in trouble with the law because they thought he shot his sister. After arriving at the police station, he also gave the Salina police a statement in which he admitted shooting the victim and described the events leading to the shooting.

On December 8, 1987, an information was filed charging Thieszen with first degree murder and the use of a firearm in the commission of a felony. On May 3, 1988, pursuant to a plea bargain, an amended information was filed charging Thieszen with second degree murder and use of a firearm in the commission of a felony. Thieszen thereafter pled guilty and was adjudged accordingly. His convictions were later affirmed by this court in *State v. Thieszen*, 232 Neb. 952, 442 N.W.2d 887 (1989).

Subsequently, on September 9, 1994, Thieszen filed a motion for postconviction relief pursuant to the provisions of Neb. Rev. Stat. § 29-3001 et seq. (Reissue 1995) on the ground that the amended information was defective in that it failed to allege he had acted with malice. The district court sustained that motion on July 25, 1995, thereby vacating and setting aside the second degree murder and use of a firearm convictions. On August 1, a second amended information was filed, once again charging Thieszen with first degree murder and use of a firearm in the commission of a felony.

With that background, we turn our attention to the assignments of error, supplying other pertinent facts with the analysis of each assignment.

### III. ANALYSIS

#### 1. Nonsuppression of Statements

In the first assignment of error, Thieszen asserts that the district court erred in failing to suppress the inculpatory statements

he made to the Salina police because he was neither advised that he could be tried as an adult nor asked whether he wished to confer with an adult before making any statement.

However, as Thieszen did not object to the admission of the statements into evidence, he is foreclosed from assigning their receipt as error. As noted in *State v. Jensen*, 238 Neb. 801, 472 N.W.2d 423 (1991), the failure to object to evidence at trial, even though the evidence was the subject of a previous motion to suppress, waives the objection, and a party will not be heard to complain of the alleged error on appeal.

## 2. STATUTE OF LIMITATIONS

We therefore move on to the second assignment of error, the claim that the use of a firearm charge is barred by the statute of limitations.

### (a) Scope of Review

The interpretation of statutes presents questions of law, in connection with which an appellate court has the obligation to reach an independent conclusion irrespective of the decision made by the court below. *Robertson v. School Dist. No. 17, ante* p. 103, 560 N.W.2d 469 (1997); *Polinski v. Omaha Pub. Power Dist.*, 251 Neb. 14, 554 N.W.2d 636 (1996); *State v. Johnson*, 250 Neb. 933, 554 N.W.2d 126 (1996).

### (b) Application of Law to Facts

Neb. Rev. Stat. § 29-110(1) (Reissue 1995) provides, in relevant part:

[N]o person or persons shall be prosecuted for any felony, excepting only treason, murder, arson, and forgery, unless the indictment for the same shall be found by a grand jury within three years next after the offense shall have been done or committed or unless a complaint for the same shall be filed before the magistrate within three years next after the offense shall have been done or committed and a warrant for the arrest of the defendant shall have been issued . . . . If any indictment, information, or suit is quashed or the proceedings in the same set aside or reversed on writ of error, the time during the pendency of such indictment, information, or suit so quashed, set aside,

or reversed shall not be reckoned within this statute so as to bar any new indictment, information, or suit for the same offense.

The question thus is whether the words "set aside . . . on writ of error" include proceedings vacated and set aside upon a motion for postconviction relief.

Section 29-110(1) finds its genesis in Gen. Stat. ch. 58, § 256, p. 783 (1873), which provided, in relevant part:

No person or persons shall be prosecuted for any felony, (treason, murder, arson and forgery excepted), unless the indictment for the same shall be found by a grand jury, within three years next after the offense shall have been done or committed. . . . *And provided, also*, That where any indictment, information, or suit shall be quashed, or the proceedings in the same set aside or reversed, on writ of error, the time during the pendency of such indictment, information or suit so quashed, set aside or reversed, shall not be reckoned within this statute, so as to bar any new indictment, information, or suit, for the same offense.

Gen. Stat. ch. 58, § 503, p. 833 (1873), provided, in relevant part:

When a person shall be convicted of an offense, and shall give notice to the court of his intention to apply for a writ of error, the court may, at its discretion, on application of the person so convicted, suspend the execution of the sentence or judgment against him until the next term of the court, or for such period, not beyond the session of the court, nor beyond the next term of the supreme court, as will give the person so convicted a reasonable time to apply for such writ.

The word "appeal" was substituted for the phrase "writ of error" by 1982 Neb. Laws, L.B. 722, as now found in Neb. Rev. Stat. § 29-2301 (Reissue 1995), which states in part: "When a person is convicted of an offense and gives notice of his or her intention to appeal to the Court of Appeals or Supreme Court, the execution of the sentence or judgment shall be suspended until such time as the appeal has been determined."

It is also important to understand that the Nebraska Constitution of 1866 provided in article I, § 18: "The writ of

error shall be a writ of right in all capital cases, and shall operate as a supersedeas to stay the execution of the sentence of death until the further order of the Supreme Court in the premises." In 1875, the language was moved to article I, § 23, and provided: "The writ of error shall be a writ of right in all cases of felony; and in capital cases shall operate as a supersedeas to stay the execution of the sentence of death until the further order of the supreme court in the premises." Pursuant to a proposal submitted to the electorate in 1972 through L.B. 196, § 23 was amended to read as follows: "In all cases of felony the defendant shall have the right of appeal to the Supreme Court; and in capital cases such appeal shall operate as a supersedeas to stay the execution of the sentence of death, until further order of the Supreme Court." Pursuant to a proposal submitted to the electorate in 1990 through L.R. 8, § 23 was again amended and currently provides, in relevant part: "In all capital cases, appeal directly to the Supreme Court shall be as a matter of right and shall operate as a supersedeas to stay the execution of the sentence of death until further order of the Supreme Court."

In the context of reviewing a judgment of contempt, we, in *In re Contempt of Liles*, 217 Neb. 414, 349 N.W.2d 377 (1984), observed that the 1972 amendment of Neb. Const. art. I, § 23, abolished writs of error in this court, and therefore our review was by appeal. In fact, in 1961, the Legislature had, in effect, abolished the writ of error and provided that appeals under the criminal code be the same as in civil cases. *State v. Longmore*, 178 Neb. 509, 134 N.W.2d 66 (1965).

In view of that legislative and constitutional history, we must conclude that under current law, the words "set aside . . . on writ of error" in § 29-110(1) mean proceedings set aside on appeal.

Having so determined, the question for us becomes whether appeal, as contemplated by § 29-110(1), includes proceedings for postconviction relief. Such relief was created in 1965; § 29-3001 provides, in relevant part:

A prisoner in custody under sentence and claiming a right to be released on the ground that there was such a denial or infringement of the rights of the prisoner as to render the judgment void or voidable under the Constitution of this state or the Constitution of the United

States, may file a verified motion at any time in the court which imposed such sentence, stating the grounds relied upon, and asking the court to vacate or set aside the sentence.

There is no question that proceedings for postconviction relief differ in many respects from appeal proceedings. For example, postconviction proceedings are available only where the prisoner has sustained such a denial or infringement of constitutional rights that the judgment is void or voidable, *State v. Ferrell*, 230 Neb. 958, 434 N.W.2d 331 (1989); postconviction proceedings are not available to secure review of issues which were or could have been litigated on direct appeal, no matter how these issues may be phrased or rephrased, *State v. Otey*, 236 Neb. 915, 464 N.W.2d 352 (1991); neither may such proceedings be used as a substitute for an appeal or to secure a further review of issues already litigated, *State v. Pratt*, 224 Neb. 507, 398 N.W.2d 721 (1987); nor may one pursue postconviction relief while one has a direct appeal pending, *State v. Moore*, 187 Neb. 507, 192 N.W.2d 157 (1971).

Yet, the ultimate purpose of postconviction proceedings is the same as the ultimate purpose of an appeal proceeding, that is, to review the validity of a conviction. Indeed, where a defendant is denied his or her right to appeal because his or her lawyer fails, when requested, to timely file a notice of appeal, the proper means to attack that denial is the postconviction proceedings. *State v. Carter*, 236 Neb. 656, 463 N.W.2d 332 (1990).

We thus conclude that postconviction proceedings fall within the ambit of the phrase "proceedings . . . on writ of error," as used in § 29-110(1).

Excluding, under the language of § 29-110, the period between September 18, 1987, and July 25, 1995, only 1 day passed between the date of the offense and the date that the original complaint was filed and the arrest warrant was issued, and only 7 additional days passed between the day the conviction was vacated and set aside and the day the second amended information was filed.

### (c) Resolution

Thus, the operative second amended information was filed well within the 3-year period of limitations specified in § 29-110(1), and there is no merit to this assignment of error.

### 3. EVIDENTIAL RULINGS

In the third assignment of error, Thieszen complains that the district court wrongly excluded psychiatric testimony concerning specific abuses to which Thieszen was subjected, and improperly received evidence interpreting certain photographs.

### (a) Evidence Excluded

Thieszen offered the testimony of psychiatrist David Kentsmith, who stated that he examined Thieszen when the latter was 14 years old and reviewed his prior history as recorded by other counselors, physicians, and police reports. Based on his observations and review, Kentsmith concluded that Thieszen suffered from a conduct disorder, including adolescent antisocial behavior. Moreover, at the time of the killing, Thieszen was, in Kentsmith's opinion, "pseudo mature":

> Because of [Thieszen's] life experiences and various emotional trauma, the abuse that he had experienced as a child, the foster homes that he had been in, and the various things that had happened to him, both physically and emotionally, that he had learned to put on an air of seeming to be somewhat older than he really was, but as you were able to get beneath that, you saw him to be a very immature young person who basically was behaving in a way that was not reflective of maturity.

Subsequently, Thieszen asked Kentsmith what kind of history caused the pseudo maturity. Kentsmith answered, "What we are referring to is the abuse that [Thieszen] experienced as a child from the time of his birth."

At this point, at the request of the State, an off-the-record bench conference was held, after which Thieszen moved in open court to strike the question, and the State moved to strike Kentsmith's previous answer. These motions were sustained. Thieszen then asked Kentsmith to describe what could cause stress for an immature, impulsive youth. During Kentsmith's

attempt to answer, the State requested another bench conference, after which the jury was removed from the courtroom. Thieszen then elicited the following from Kentsmith:

> The history that [Thieszen] could recall and provide to me, and the other information that I have been able to glean from other people who had examined him, included being born into a family where the mother was a severe alcoholic, and during her alcoholic binges would be very physically abusive to him, including one time trying to burn his eyes with a cigarette lighter; and another instance stomping him; and another instance throwing him into a swimming pool when he couldn't swim and having to have somebody rescue him. This was all before the age of five. And other instances where she would take him with her to burglarize places; and also instances where she neglected him completely, so that he was physically dirty and was not bathed, and his clothes were not changed. These are instances of the type of abuse that he had experienced before age five.

Kentsmith further explained that when one is physically beaten and punished by adults as a child, the child learns how to behave as those adults, stating:

> If they teach you that that's how adults interact with children, as you begin to mature you may use that same form to interact with other people in terms of your reaction, and instead of using more thoughtful reflective approaches to things, you may act, in other words, if his mother was violent and exploded anytime she was frustrated or angry, and result in physical actions, then that would be a sort of format for him if he was in a situation later on, because that's how he is learning, he's learning from adults how to behave.

The State urged that such specific instances of abuse testimony was not relevant and was designed primarily to engender sympathy for the accused. The district court ruled that Thieszen could

> present evidence of and explain any diagnosis that this particular witness had of . . . Thieszen after he examined him. This witness can explain and testify as to whether or

not [Thieszen] had or suffered any severe mental disease or defect and, if so, what are the characteristics of such mental disease or defect, and certainly this witness can testify as to the personality problems of one who might be impulsive or suffer any of the other traits which might be attributed to . . . Thieszen.

When asked whether the ruling meant that Kentsmith could not relate the various episodes of abuse Thieszen claimed to have suffered from his natural mother, the district court stated, "Well, we're going to have to ask the questions and the court will have to rule during the trial."

After the jury returned, Thieszen asked Kentsmith to give examples that would create a "no-win" situation for him and his impulsive personality. The State objected to specific examples being given, and the district court ruled that Kentsmith could relay general examples. Kentsmith testified:

As it relates to an immature young person adolescent, an example would be being expected to get straight A's in school and in all subjects and not really having the intellectual ability to do that, or maybe even the background to do that if you do have the intellectual ability, and as a consequence then facing punishment because you didn't get straight A's.

Or being told that you have to keep your room perfect with not a piece of clothing out of place or anything on the floor, and bed perfectly made under certain restrictions, and for a young person to be able to do this perfectly would not be possible, and as a consequence there would be punishment as a result of that.

Those would be examples of a person who would feel trapped, being asked, demand placed on them to do something in a way, or being required to do something that they couldn't do as perfectly as was expected and then knowing they are going to get punished and feeling trapped.

Kentsmith further testified that one who is immature and impulsive would resort to either fight or flight, trying to run away or fight like a trapped or cornered creature.

Thieszen then called psychiatrist William Logan. He testified that he interviewed Thieszen and one of his long-term thera-

pists; went to Thieszen's home; talked to members of his family; and reviewed a variety of materials, including police reports, Thieszen's statement to the police, an earlier psychological evaluation, Kentsmith's evaluation and testing, and Thieszen's adoption documents; and based on the foregoing, diagnosed Thieszen as having a conduct disorder.

Logan further testified that Thieszen was impulsive, quick to react to things, and not one to use very much judgment or think before he acted. When asked what causes impulsive reactions to worsen in an individual, he answered:

> Oh, it can be a whole host of things. It can be things that are troubling the individual about his relationship with his peers; it can be things that are troubling him about his relationship with his parents; many times it may go back to earlier issues, particularly if there has been a history of sexual abuse or physical abuse, as there had been in this case in both the natural family and in the adoptive family.

After the State unsuccessfully moved to strike the foregoing statement on the basis that it was volunteered, Thieszen changed the topic of his direct examination.

Thieszen argues that the district court erred in refusing to allow his psychiatric experts to testify at trial about specific abuses to which Thieszen was subjected, as that would have enabled the jury to better understand their opinions and better understand how Thieszen would react under stressful conditions. It appears Thieszen further urges that evidence concerning how the events of his family life had affected his personality and conception of reality was admissible under *State v. Reynolds*, 235 Neb. 662, 457 N.W.2d 405 (1990), holding that evidence of an accused's mental condition at the time the offense was committed is admissible to prove absence of intent.

But under this record it is not necessary for us to determine whether testimony concerning specific acts of abuse was admissible, for, as the foregoing review of the relevant testimony demonstrates, notwithstanding that the district court made clear it would not rule on the admissibility of the evidence until trial, that is, when the jury was present, Thieszen made no such inquiry.

It is true that Thieszen asked Kentsmith in the presence of the jury for examples of what would create a "no-win" situation, but that is a far different matter than asking for examples of past abuse that resulted in Thieszen's condition. Similarly, asking Logan what can cause impulsive reactions to worsen is different than asking for examples of past abuse which produced the impulsivity. We cannot speculate as to how a trial court would have ruled on objections not made to questions not asked. See *Holman v. Papio-Missouri River Nat. Resources Dist.*, 246 Neb. 787, 523 N.W.2d 510 (1994).

### (b) Evidence Admitted

#### *(i) Scope of Review*

In all proceedings where the Nebraska Evidence Rules apply, admissibility of evidence is controlled by rule, not judicial discretion, except in those instances under the rules when judicial discretion is a factor involved in the admissibility of evidence. *State v. Morris*, 251 Neb. 23, 554 N.W.2d 627 (1996).

#### *(ii) Application of Law to Facts*

Thieszen urges that the district court improvidently permitted Jerry L. Kreps to interpret certain photographic evidence as an expert. Thieszen objected to receipt of this testimony on the grounds that Kreps lacked expert qualifications and that the evidence was not relevant.

Kreps testified that he had a master's degree in science with a major in biochemistry and had major hours in physics, mathematics, and biology; his education included training with regard to the physics of flowing fluids, the viscosity of fluids, and the "absorbtivity of fluids." Although he had had no formal training in the area of forensic interpretation of evidence, he studied forensic science on his own "[t]hrough the University of Nebraska, through the law libraries; in the understanding of physics and the teaching of physics at the college level; and other self-motivated and self-interested avenues."

He was certified by the state to teach chemistry, physics, mathematics, biology, and general science, and at the time of trial was employed as a substitute teacher for the Lincoln public school system. Prior to taking on such work, Kreps spent 16

years in his own consulting business, in which he performed computer consulting, electronics consulting, and criminal forensics investigations. For 8 years, he taught engineering, physics, electronics, computer science, anatomy, physiology, microbiology, organic chemistry, inorganic chemistry, general science, and astronomy at York College. Although Kreps had not prior to this case testified about the flow of fluids, his work had required the examination and evaluation of photographs of crime scenes.

The evidence includes photographs of the victim with the front of her denim shorts unzipped and her underpants pulled down. After examining photographs of the victim's clothing and body and other aspects of the crime scene, Kreps explained that the location of various blood stains established that the shorts had been unzipped and the underpants pulled down after she had been shot.

Four preliminary questions must be answered in order to determine whether an expert's testimony is admissible: (1) whether the witness qualifies as an expert pursuant to Neb. Evid. R. 702, Neb. Rev. Stat. § 27-702 (Reissue 1995); (2) whether the expert's testimony is relevant; (3) whether the expert's testimony will assist the trier of fact to understand the evidence or determine a controverted factual issue; and (4) whether the expert's testimony, even though relevant and admissible, should be excluded in light of Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 1995). *State v. Lopez*, 249 Neb. 634, 544 N.W.2d 845 (1996); *State v. Reynolds*, 235 Neb. 662, 457 N.W.2d 405 (1990). Thieszen does not argue that Kreps' testimony would not help the jury understand the photographic evidence, only that Kreps was not an expert, that the evidence is not relevant, and that even if relevant, it should be excluded under the provisions of rule 403 as unfairly prejudicial.

There is no exact standard for determining when one qualifies as an expert, and a trial court's factual finding that a witness qualifies as an expert will be upheld on appeal unless clearly erroneous. *Main Street Movies v. Wellman*, 251 Neb. 367, 557 N.W.2d 641 (1997). We cannot say that under the circumstances of this case, the district court was clearly wrong in concluding that Kreps was qualified as an expert to interpret the photo-

graphic evidence so as to explain the condition of the clothes at the time of the shooting.

We thus move on to the question of whether his testimony was relevant, and recall that such evidence is that evidence which has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Neb. Evid. R. 401, Neb. Rev. Stat. § 27-401 (Reissue 1995); *State v. Newman*, 250 Neb. 226, 548 N.W.2d 739 (1996). Kreps' testimony suggests that there was a sexual component to the shooting and thus bears on the issue of Thieszen's deliberation and premeditation. Deliberation and premeditation are elements of the crime of first degree murder, § 28-303; therefore, the evidence was relevant, notwithstanding that Thieszen ascribed a different motive to the killing.

However, as Thieszen correctly notes, under the provisions of rule 403, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." See *Otey v. State*, 240 Neb. 813, 485 N.W.2d 153 (1992). In the context of this rule, "unfair prejudice" means an undue tendency to suggest a decision on an improper basis. *State v. Perrigo*, 244 Neb. 990, 510 N.W.2d 304 (1994). The admission of expert testimony is ordinarily within the discretion of the trial court, and its ruling will be upheld in the absence of an abuse of discretion. *State v. Dean*, 246 Neb. 869, 523 N.W.2d 681 (1994), *cert. denied* 515 U.S. 1123, 115 S. Ct. 2279, 132 L. Ed. 2d 282 (1995). It cannot be said that legitimate inferences drawn from evidence bearing upon the existence of the elements of the crime charged, in this case deliberation and premeditation, suggest a decision on an improper basis. Thus, the district court did not abuse its discretion in receiving Kreps' testimony.

### (c) Resolution

Accordingly, there is no merit to the third assignment of error.

### 4. NONDIRECTION OF VERDICT

In the fourth and final assignment of error, Thieszen claims the district court erred in failing to direct a verdict in his favor.

However, he has not argued this assignment in his brief. The dispositive rule is that absent plain error, assignments of error not discussed in the briefs will not be addressed by an appellate court. See, Neb. Ct. R. of Prac. 9D(1)d (rev. 1996); *State v. Severin*, 250 Neb. 841, 553 N.W.2d 452 (1996). The quantum of evidence pointing to Thieszen's guilt precludes any suggestion that it was plain error to not direct a verdict in his favor. Thus, this assignment of error is also meritless.

### IV. JUDGMENT
Consequently, as first noted in part I above, the judgment of the district court is affirmed.

AFFIRMED.