In re Interest of Tabatha R., a child under 18 years of age. State of Nebraska, appellee and cross-appellee, v. Ronda R., appellant, Ronald D., appellee and cross-appellant, and Nebraska Department of Social Services, interested party, appellee.

564 N.W.2d 598

Filed June 20, 1997.    No. S-96-552.

A. Michael Bianchi for appellant.

Regina T. Makaitis for appellee State.

Dean M. Johnson for appellee Ronald D.

Don Stenberg, Attorney General, Royce N. Harper, and Douglas D Dexter, Special Assistant Attorney General, for appellee Nebraska Department of Social Services.

Thomas M. Kenney, Douglas County Public Defender, and Ann C. Holtz, guardian ad litem for Tabatha R.

V. Gene Summerlin, of Gelt, Fleishman, Sterling & Ogborn, P.C., and James Bopp, Jr., Thomas J. Marzen, Daniel Avila, and Jane E.T. Brockmann, of National Legal Center for the Medically Dependent and Disabled, Inc., for amicus curiae Scholl Institute of Bioethics.

Carr E. Heaney, Jr., of Kennedy, Holland, DeLacy & Svoboda, for amicus curiae Creighton-Saint Joseph Regional Healthcare System, L.L.C., doing business as Saint Joseph Hospital.

WHITE, C.J., CAPORALE, WRIGHT, CONNOLLY, GERRARD, STEPHAN, and MCCORMACK, JJ.

PER CURIAM.

Claiming, among other things, that the juvenile court erred in assenting to the determination of the then Nebraska Department of Social Services to withdraw life support measures from their infant girl, Tabatha R., and to not resuscitate her, the infant's mother, Ronda R., filed an appeal, and the infant's father, Ronald D., cross-appealed, taking the same positions as did the mother. Since the parents present a question of first impression and challenge the constitutional validity of so assenting in the absence of a termination of parental rights, the matter was docketed in this court rather than in the Nebraska Court of Appeals. See Neb. Rev. Stat. § 24-1106 (Reissue 1995). We reverse, and remand for further proceedings.

## SCOPE OF REVIEW

Cases arising under the Nebraska Juvenile Code, Neb. Rev. Stat. §§ 43-245 through 43-2,129 (Reissue 1993, Cum. Supp.

1994 & Supp. 1995), are reviewed de novo on the record, and the appellate court is required to reach a conclusion independent of the trial court's findings; however, where the evidence is in conflict, the appellate court will consider and may give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over another. *In re Interest of Jeffrey R.*, 251 Neb. 250, 557 N.W.2d 220 (1996). Nonetheless, in reviewing questions of law, an appellate court in proceedings under the Nebraska Juvenile Code reaches a conclusion independent of the lower court's ruling. See *In re Interest of Krystal P. et al.*, 251 Neb. 320, 557 N.W.2d 26 (1996).

## EVENTS LEADING TO INFANT'S CONDITION

The infant was born on December 29, 1995, and shortly thereafter was diagnosed as suffering from respiratory syncytial viral disease. According to statements made by the mother to a department investigator, the apartment in which the family lived became extremely cold on January 18, 1996; on January 20, the mother took the infant to St. Joseph Hospital because she was concerned about the infant's breathing and congestion. The physician recommended the use of a home squeegee procedure; however, the infant continued to be congested.

On January 21, 1996, the mother went to bed close to midnight. The infant awoke at 3 a.m., January 22, and the mother performed the squeegee procedure and fed the infant at 3 and again at 5 a.m. After that, the infant slept through most of the day, only to awake for occasional feedings. The mother prepared lunch for her other children at 3 p.m., during which time the infant stayed in the bedroom with the father. Although the mother was in the kitchen, she could hear the infant crying in the bedroom. Because the mother could not stand to hear the crying and the father was not getting up to care for the infant, the mother took her and placed her in a swing. The infant continued to cry, so the mother prepared a bottle, took both the infant and the bottle to the father, and asked him to feed the infant. The mother later returned to the bedroom in order to burp the infant and again left her with the father.

Between 3 and 3:30 p.m., after feeding her other children, the mother lay down in the bedroom to take a nap while the father

went into the living room to watch television. Around 5 or 5:30 p.m., the father went into the bedroom, awakened the mother, and told her to get up and fix supper. The father then mentioned that the infant's lips were purple, whereupon the mother began blowing in the infant's mouth in an attempt to remove congestion from the infant's nose. Since the infant did not resume breathing, the mother put the infant on her back, pulled the infant's arms back and forth, gently shook her, and told the father to call for an ambulance.

The father's account of the events was consistent with the mother's, and he recalled that the mother was very exhausted when she went to take her afternoon nap. As the family had no telephone, he went downstairs to a neighbor to place the call.

A stranger then arrived and performed cardiopulmonary resuscitation on the infant, apparently using his entire hand on the infant's chest. There is evidence that the proper method of resuscitating an infant is through the use of two fingers pressing down approximately ½ inch on the chest. When the ambulance arrived, the infant was still not breathing and blood was coming out of her nose.

One of the paramedics arriving at the scene at 5:51 p.m. noted that the infant was pale and bluish, indicating a lack of oxygen, and that she had no pulse. He began cardiopulmonary resuscitation, using two fingers for compression, as he reached the bottom of the stairs on the way to the rescue squad ambulance. When they entered the ambulance, the paramedic continued his efforts while his partner unsuccessfully attempted to administer oxygen by a tube inserted into the infant's lungs through her mouth. The paramedic then used an oxygen mask, and they proceeded directly to St. Joseph Hospital, arriving at 5:55 p.m. Cardiopulmonary resuscitation was continued after the infant was carried into the trauma room, at which point she was still in full cardiac and pulmonary arrest.

## PROCEEDINGS BELOW

The juvenile court on January 26, 1996, entered an emergency ex parte order placing temporary custody of the infant in and with the department. Following a detention hearing, the court thereafter, on February 6, without resistance from the par-

ents, continued temporary custody in and with the department and authorized it to consent to any medical, surgical, or psychiatric treatment which in the opinion of a licensed and practicing physician "may be necessary and in the best interest of" the infant.

## DEPARTMENT'S DETERMINATION

The department subsequently, on March 12, 1996, filed with the juvenile court a so-called "Notification of Informed Consent," which advised the parents that it intended to direct St. Joseph Hospital, effective March 14, to remove the infant from the "mechanical ventilator and all extraordinary life support" systems and to "not resuscitate" her. On March 15, the mother filed with the juvenile court a motion seeking an order staying the department from giving such instruction. Following a hearing on March 19, at which both parents were represented, the court entered a stay order, pending further hearing.

## JUVENILE COURT'S ASSENT

On April 29, an adjudication hearing was had, resulting in the filing of an order on May 3 in which the court concluded that the evidence establishes, by a preponderance of the evidence, the standard of proof set out in § 43-279.01(3), that the infant comes within its jurisdiction; concluded that the evidence further establishes, by clear and convincing evidence, that it is in the infant's best interests that life support be discontinued and that she not be resuscitated; and assented to the department's determination.

Unfortunately, our review is complicated by the irregular sequence in which the matter was presented to and considered by the juvenile court. While we have had occasion to express concern with the department's delays, see, e.g., *In re Interest of L.C., J.C., and E.C.*, 235 Neb. 703, 457 N.W.2d 274 (1990), here, the department acted with uncharacteristic and untoward haste, seeking the assent of the juvenile court to the department's determination upon only 2 days' notice to the parents and before the juvenile court had adjudged the infant to be subject to its jurisdiction. As a consequence, much of the evidence relating to the department's determination was developed on the

parents' motion to stay its implementation, again before the infant had been adjudged to be within the court's jurisdiction. Nonetheless, as the juvenile court did not assent to the department's determination until the court had asserted jurisdiction over the infant, the irregular procedural sequence did not prejudice the parents.

## REVIEW OF EVIDENTIAL RULINGS

However, because of the irregular sequence, we, in conducting our de novo review, treat the evidence adduced on the parents' motion and the State's petition to have been adduced as part of the adjudication hearing, and thus apply to both hearings the "customary rules of evidence," as required in adjudication hearings by § 43-279(1). See, also, *In re Interest of J.L.M. et al.*, 234 Neb. 381, 451 N.W.2d 377 (1990). Accordingly, the juvenile court's evidential rulings must be tested in accordance with the rule that in proceedings where the Nebraska Evidence Rules apply, admissibility of evidence is controlled by rule, not judicial discretion, except in those instances under the rules when judicial discretion is a factor involved in the admissibility of evidence. See, *State v. Thieszen, ante* p. 208, 560 N.W.2d 800 (1997); *State v. Earl, ante* p. 127, 560 N.W.2d 491 (1997); *Floyd v. Worobec*, 248 Neb. 605, 537 N.W.2d 512 (1995).

The parents assert the juvenile court erroneously excluded a booklet entitled "Charter for Health Care Workers," written by the Pontifical Council for Pastoral Assistance to Health Care Workers, and the opinion of a physician as to whether persons without a cortex can be kept alive outside of a hospital setting. However, neither items of evidence were relevant, and, thus, the juvenile court did not err in excluding them. While evidence as to the bioethical considerations followed by a certain religious group may be relevant in cases in which the policy of a particular health care provider is at issue, see, e.g., *Taylor v. St. Vincent's Hospital*, 523 F.2d 75 (9th Cir. 1975), there is no such issue here. Neither was the excluded opinion relevant, for whether the infant is capable of being kept alive in whatever setting is not an issue.

The parents also assert that the juvenile court erred in admitting certain evidence concerning the bioethical considerations

employed, the medical condition of the infant and the cause thereof, and the parents' role therein. As noted earlier, the bioethical evidence is irrelevant. Although the hospital records are inadmissible hearsay, there is, contrary to the parents' assertion, adequate foundation for the medical testimony received on the issue of the infant's condition and its cause. However, the department investigator's recitation of how the mother's 4-year-old daughter described the relationship between the mother and father is inadmissible hearsay. But the improper admission of evidence in a juvenile proceeding does not, in and of itself, constitute reversible error, for as long as proper objection was made at trial, an appellate court, in its review, ignores information which was improperly received. *In re Interest of R.G.*, 238 Neb. 405, 470 N.W.2d 780 (1991).

## INFANT'S CONDITION

Although there is some conflict in the admissible medical evidence, we independently find, on de novo review of the record, that under any civil standard of proof, the record establishes that the infant is irreversibly comatose and in a persistent vegetative state.

We further find that because of the daily nutrition, hydration, and hormone treatments she receives, the infant has grown. Nonetheless, although the infant has an independent heartbeat, she has not taken a breath on her own since her admission to the hospital, has shown no ability to breathe on her own, and is dependent upon a mechanical ventilator.

Moreover, we find that the infant has lost all functioning that originates from the cerebral hemispheres of her brain and has only limited brain stem functions, resulting in reflexive sucking movements, response to loud sounds, random movements, decerebrate posturing, and partial corneal responses.

We also find that because the thinking part of her brain is gone, she has no meaningful interaction with her environment or with others. As brain tissue does not regenerate, treatment will not improve her condition, and she will never breathe on her own, turn over, sit up, crawl, walk, speak, think independently, or solve problems. She can feel nothing, do nothing, and will do nothing for the rest of her life.

Nevertheless, we find that the presence of the independent heartbeat and the existence of some brain stem activity mean that the infant is alive, for only one who has sustained either "irreversible cessation of circulatory and respiratory functions, or . . . irreversible cessation of all functions of the entire brain, including the brain stem, is dead." Neb. Rev. Stat. § 71-7202 (Reissue 1996). See, also, *State v. Meints*, 212 Neb. 410, 322 N.W.2d 809 (1982).

## CAUSE OF CONDITION

Although the admissible evidence is not without conflict, we independently find, on de novo review of the record, that under any civil standard of proof, the record establishes that the infant's condition is the result of her having sustained severe brain injury as the consequence of having been vigorously shaken, not, as the parents suggest, as the result of respiratory syncytial viral disease, the method in which she was resuscitated, or any other cause.

As the infant's attending physician explained:

the baby's head accelerates and decelerates as it moves back and forth. And it's the force from that acceleration/ deceleration-type injury that leads to the bleeding. . . . Young infants who have not developed head control, who don't have good strength of the neck muscles to help support their head during that movement are at risk for this particular problem.

## AUTHORITY TO DIRECT TREATMENT

Having independently made those factual findings, we turn our attention to the legal question as to whether the department had authority to determine as it did.

Section 43-285(1) reads, in relevant part:

When the court awards a juvenile to the care of the [department] . . . the juvenile shall, unless otherwise ordered, become a ward and be subject to the guardianship of the department . . . . [T]he department shall have authority, by and with the assent of the court, to determine the . . . medical services . . . on behalf of each juvenile committed to it.

Deciding whether to remove one from life support measures and whether to resuscitate one requires the exercise of medical judgment; therefore, such acts constitute medical services. Having acquired temporary custody of the infant, the department was initially empowered by § 43-285(1) to determine as it did.

## VALIDITY OF ASSENT

However, under the language of § 43-285(1), at least where the department's initial determination is questioned, it can become effective only if specifically assented to by the juvenile court. *State v. Salyers*, 239 Neb. 1002, 480 N.W.2d 173 (1992) (judicial authority may not be delegated). Accord, *State v. Lee*, 237 Neb. 724, 467 N.W.2d 661 (1991); *Ensrud v. Ensrud*, 230 Neb. 720, 433 N.W.2d 192 (1988). The dispositive legal issue therefore becomes whether the juvenile court validly assented. The parents urge not, asserting, in effect, that the assent serves as the functional equivalent of a judgment terminating their parental rights and violates their constitutionally protected liberty interest in their relationship with the infant.

Although in making their argument the parents rely upon provisions of both the U.S. Constitution and article I, § 3, of the Nebraska Constitution, declaring that no person shall be deprived " 'of . . . liberty . . . without due process of law,' " brief for appellant at 22, we analyze and decide the matter under the Nebraska Constitution, and do not reach any federal constitutional question. While in making our analysis of the parents' rights under the Nebraska Constitution, we cite to a U.S. Supreme Court case and to a Nebraska case which refers to that U.S. Supreme Court case, we do so only for the purpose of guidance in interpreting the Nebraska Constitution, not because we consider any U.S. Supreme Court case to compel the result we reach.

We agree that since the implementation of the department's determination is likely to result in the infant's death and thereby sever the relationship between the infant and the parents, the juvenile court's assent is the functional equivalent of a judgment terminating parental rights. We therefore hold that where a proceeding to obtain the juvenile court's assent to the medical services determined by the department under § 43-285(1)

results in the functional equivalent of a proceeding to terminate parental rights, the same due process must be afforded in the assent proceeding as is required in a proceeding to terminate parental rights. In so holding, we are not unmindful of the ruling in *Lovato v. Dist. Ct.*, 198 Colo. 419, 601 P.2d 1072 (1979), that ordering the withdrawing of life support did not terminate parental rights; however, *Lovato* is inapposite, for there the child was dead when the withdrawal order was entered.

Although parental rights are not absolute or inalienable, *State v. Duran*, 204 Neb. 546, 283 N.W.2d 382 (1979), such rights do not

> evaporate simply because [the parents] have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life. If anything, persons faced with forced dissolution of their parental rights have a more critical need for procedural protections than do those resisting state intervention into ongoing family affairs.

*Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982).

Before parental rights may be terminated, Neb. Const. art. I, § 3, requires that the evidence clearly and convincingly establish the existence of one or more of the statutory grounds permitting such and that such is in the juvenile's best interests. See, § 43-292; *In re Interest of J.B. and A.P.*, 235 Neb. 74, 453 N.W.2d 477 (1990); *In re Interest of J.S., A.C., and C.S.*, 227 Neb. 251, 417 N.W.2d 147 (1987).

We recognize that in deciding to assent to the department's determination, the juvenile court found the evidence to clearly and convincingly establish that so doing was in the infant's best interests. However, the fact remains that the juvenile court initially asserted jurisdiction over the relationship between the infant and the parents on the basis of a preponderance of the evidence standard. Its later finding with respect to the department's determination is not the equivalent of a finding that the evidence clearly and convincingly establishes that the relation-

ship between the infant and each of the parents should be terminated.

## CONCLUSION

For the foregoing reasons, the judgment of the juvenile court is reversed and the cause remanded for further proceedings consistent with this opinion.

REVERSED AND REMANDED FOR
FURTHER PROCEEDINGS.

WRIGHT, J., concurring.

I concur in the result, but I write separately to point out the procedure that I believe is required by the Department of Social Services (DSS).

The issue presented is whether DSS, which has temporary custody of the minor, can request that life support be withdrawn from the minor and that the minor not be resuscitated. Such a request necessarily requires as a first prerequisite that all rights of the parents to the child be terminated.

Neb. Rev. Stat. § 43-292 (Reissue 1993) provides that the court may terminate all parental rights between the parents and the juvenile when the court finds such action to be in the best interests of the juvenile and one or more of the following conditions exist: "(2) The parents have substantially and continuously or repeatedly neglected the juvenile . . . (6) Following a determination that the juvenile is one as described in subdivision (3)(a) of section 43-247, reasonable efforts, under the direction of the court, have failed to correct the conditions leading to the determination . . . ."

In my opinion, there are factual situations in which only one act by a parent is sufficient to provide the basis for termination under § 43-292. Parental conduct which results in serious and permanent injury to the juvenile does not have to be continuous or repeated under § 43-292(2), nor would efforts to correct the condition be required under § 43-292(6) before the court could proceed with termination. An act by the parent or parents which causes severe and permanent injury to the juvenile is enough to permit the court to terminate all parental rights between the parents and the juvenile under § 43-292.

In appeals from the termination of parental rights in a county court sitting as a juvenile court, an appellate court reviews such

cases de novo on the record. See *In re Interest of D.W.*, 249 Neb. 133, 542 N.W.2d 407 (1996). An order terminating parental rights must be based upon clear and convincing evidence and should be issued as a last resort when no reasonable alternative exists. DSS' request will have a permanent result, and until parental rights have been terminated, DSS does not have the right to request a court order which would permit medical support personnel to withdraw life support and medical treatment being given to the minor child in question.