Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
09/17/2021 08:11 AM CDT

In re Interest of Mateo L. et al., children
under 18 years of age.
State of Nebraska, appellant, v. Juana L., appellee
and cross-appellee, and Lucinda K. Bauer,
guardian ad litem, for Mateo L. et al.,
appellee and cross-appellant.

___ N.W.2d ___

Filed June 25, 2021.    No. S-20-626.

1. **Juvenile Courts: Appeal and Error.** An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below.
2. **Juvenile Courts: Evidence: Appeal and Error.** When the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another.
3. **Parental Rights: Proof.** Neb. Rev. Stat. § 43-292 (Reissue 2016) contains 11 separate subsections, any one of which can serve as a basis for terminating parental rights when coupled with evidence that termination is in the best interests of the child.
4. ____: ____. To terminate parental rights, it is the State's burden to show by clear and convincing evidence both that one of the statutory bases enumerated in Neb. Rev. Stat. § 43-292 (Reissue 2016) exists and that termination is in the child's best interests.
5. **Statutes.** Statutory language is to be read according to its plain and ordinary meaning.
6. **Parental Rights: Time.** The period of out-of-home placement set in Neb. Rev. Stat. § 43-292(6) (Reissue 2016) as a ground for termination of parental rights was set by the Legislature as a guideline for what would be a reasonable time for parents to rehabilitate themselves to a minimum degree of fitness.
7. **Parental Rights: Proof.** Neb. Rev. Stat. § 43-292(7) (Reissue 2016) operates mechanically and, unlike the other subsections of the statute,

does not require the State to adduce evidence of any specific fault on the part of a parent.

8. **Parental Rights: Legislature.** Out-of-home placement is itself defined by the Legislature as an independent ground for termination, since children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity.

9. **Parental Rights: Juvenile Courts.** Reasonable efforts to reunify a family are required under the juvenile code only when termination is sought under Neb. Rev. Stat. § 43-292(6) (Reissue 2016).

10. **Parental Rights.** Whereas statutory grounds are based on a parent's past conduct, the best interests inquiry focuses on the future well-being of the child.

11. **Constitutional Law: Due Process: Parental Rights: Proof.** Showing that termination of parental rights is in the best interests of the child is necessarily a particularly high bar, since a parent's right to raise his or her children is constitutionally protected. The Due Process Clause of the U.S. Constitution would be offended if a state were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness.

12. **Parental Rights: Presumptions.** There is a rebuttable presumption that it is in the child's best interests to share a relationship with his or her parent.

13. **Parental Rights: Presumptions: Proof.** The presumption that it is in the child's best interests to share a relationship with his or her parent can only be overcome by a showing that the parent is either unfit to perform the duties imposed by the relationship or has forfeited that right.

14. **Parental Rights: Statutes: Words and Phrases.** Although the term "unfitness" is not expressly stated in Neb. Rev. Stat. § 43-292 (Reissue 2016), it derives from the fault and neglect subsections of that statute and from an assessment of the child's best interests.

15. **Parental Rights: Words and Phrases.** Parental unfitness means a personal deficiency or incapacity that has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and that has caused, or probably will result in, detriment to a child's well-being.

16. **Parental Rights.** The best interests and parental unfitness analyses in the context of a termination of parental rights case require separate, fact-intensive inquiries, but each examines essentially the same underlying facts.

17. **Parent and Child: Time.** Neb. Rev. Stat. § 43-292(7) (Reissue 2016) serves the purpose of providing a reasonable timetable for parents to rehabilitate themselves.

18. \_\_\_\_ : \_\_\_\_. Termination based on the ground that a child has been in out-of-home placement for 15 of the past preceding 22 months is not in a child's best interests when the record demonstrates that a parent is making efforts toward reunification and has not been given a sufficient opportunity for compliance with a reunification plan.

19. **Parent and Child.** Parental obligation requires a continuing interest in the children and a genuine effort to maintain communication and association with the children.

20. **Constitutional Law: Parent and Child.** That the foster parents might provide a higher standard of living does not defeat the parent's right to maintain the constitutionally protected relationship with his or her child.

Appeal from the County Court for Madison County: Donna F. Taylor, Judge. Affirmed.

Gail Collins and Nathan Eckstrom, Deputy Madison County Attorneys, for appellant.

Bradley C. Easland, of Egley, Fullner, Montag, Morland & Easland, P.C., for appellee Juana L.

Lucinda K. Bauer, of Law Offices of Lucinda K. Bauer, guardian ad litem.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Per Curiam.

This appeal concerns the State's petition to terminate a mother's parental rights based on one proven instance of neglect, her actions in escaping an abusive boyfriend and obtaining work to support her children, and her children's out-of-home placement after her arrest. The juvenile court denied termination, finding that the State had failed to clearly and convincingly show that a statutory basis for termination existed or that termination was in the children's best interests.

We agree that the State has fallen short of carrying its heavy burden for termination. Accordingly, we affirm.

## FACTS

### Arrival in United States

Juana L. was 16 years old when she came to this country from Guatemala with her two children, Mateo L. and Pedro L. She had grown up speaking K'iche', a Mayan language common in Guatemala's central highlands, and knew almost no Spanish or English. She had little money. She eventually settled with her children in Norfolk, Nebraska, where she met and began dating Carlos P. She and the children moved in with Carlos. About a year later, when Juana was 17 years old, she gave birth to her third child, Bryan L.

Around the time of Bryan's birth, various nongovernmental service providers spent time with the family, providing aid. They transported Juana as needed, interpreted at her prenatal appointments, provided supplies for the new baby, and even called an ambulance to Juana's house when she went into premature labor. From their experience working with Juana during this period, the service providers stated that while she appeared to lack resources and to be overworked babysitting other children in addition to her own, she was adequately caring for her children.

### Proven Instance of Neglect

The Nebraska Department of Health and Human Services (DHHS) became involved, however, when Bryan was approximately 1 month old. Juana and Carlos were taking Bryan to a doctor's appointment when a service provider who had accompanied them determined that Mateo and Pedro, who were respectively 4 and 2 years old, had been left at home alone. The service provider called police, who found the boys unharmed at the house. A man who lived in the basement of the house was sleeping downstairs. But because the children were unsupervised, Juana was cited with neglect.

Since Juana, then 17 years old, was still a minor, the charge was filed as a juvenile court matter under Neb. Rev. Stat. § 43-247(1) (Reissue 2016). According to the charging

petition, "officers responded to the home of the juveniles as the mother had left the two oldest children home alone while she went to a medical appointment with the youngest juvenile." While the petition further averred that "[t]his was not the first time the mother [had] left her children home alone while she went to appointments," the State offered no evidence at the hearing of any other such instances.

Juana admitted to the charge, stating, through an interpreter:

Well, what happened was in that time it was the only time that I have left them alone. See, the thing what happened that I had to go, and usually [Carlos] stays with them, but this — this time I had to take [Carlos] with me, but that was the only time that I have been done this.

Again, when pressed as to whether she admitted to the charge of neglect, Juana confessed through an interpreter, "Yes. I admit that, that I left them alone, but only once."

Accepting that admission, the county court for Madison County, sitting as a juvenile court, dismissed the § 43-247(1) charge against Juana and adjudicated her children as neglected under § 43-247(3)(a). As a factual basis, the juvenile court found that "at least on . . . August 24th, 2017, [the children] were in a situation dangerous to their health or morals." While physical custody over the children remained with Juana, the juvenile court transferred legal custody over the children to DHHS. A guardian ad litem was also appointed to represent the children.

At a hearing a short time later, the parties agreed that Juana appeared to be making progress, but there were some concerns. For instance, a few social workers stated that Juana did not seem properly "attached" to the children. There were also reports of medical issues, including bedbugs, scabies, cavities in Mateo's teeth, and Bryan's "flat head," which doctors believed was due to his lack of "tummy time." Several social workers expressed concern about Carlos' relationship with the family. Carlos tended to dominate conversations with Juana and would follow her throughout the house to listen

and interject when social workers attempted to speak with her in private. At least one social worker expressed concern that Juana might be a human trafficking victim.

Still, the social workers generally concurred in reporting that their services were helping and that Juana's children appeared happy and well cared for. Based on these reports, the juvenile court maintained the above arrangement of physical custody with Juana and legal custody with DHHS.

### Relocation to Minnesota

Approximately 3 months after the adjudication and transfer of legal custody over the children, DHHS discovered that Juana and her children had left the Norfolk area. Although she told social workers over the phone that they were merely traveling the short distance to Grand Island, Nebraska, DHHS traced Juana's phone calls to Willmar, Minnesota. Since her relocation out of state was in violation of the children's custody arrangement, the juvenile court issued a warrant for Juana's arrest. The juvenile court also issued an ex parte order authorizing the children to be taken into DHHS custody.

Juana was eventually arrested by Willmar police, and her children were placed into temporary foster care. Police learned that Juana's mother and father also lived in Willmar. With the help of her parents and a friend who could watch the children during the day, Juana had taken a job at a turkey processing facility. However, since she lacked legal documentation, she had used a false name and falsified driver's license, Social Security card, and birth certificate to apply for the job. She was charged with felony counts of forgery and using false identification.

While in the custody of Willmar police, Juana disclosed that her relocation from Norfolk had been an escape from Carlos. She said that Carlos had physically and sexually abused her and had physically abused the children. Questioned why she had not disclosed Carlos' abuse sooner, Juana stated that she had not thought the police could help. She said that

it was not something that people typically did in her culture because police there would unlikely help anyway. Based on this account, Juana began working with an immigration attorney to apply for asylum and a visa.

In the Willmar criminal case, Juana ultimately pled guilty to one felony count of forgery. Pursuant to a plea deal, the remaining charge was dismissed. She was discharged based on time served and ordered to complete probation. She was then extradited to Nebraska to face the felony charge for violation of custody. And because she was undocumented, a hold was placed on her by U.S. Immigration and Customs Enforcement (ICE) authorities.

## 21 Months in Custody

When Juana was returned to Nebraska, her children had already been back in the state for approximately 2 months. From their temporary foster care in Willmar, they had been picked up by a DHHS social worker and returned to the Norfolk area. Much of Juana's family was apparently not considered for placement due to DHHS' refusal to place the children with family members who were undocumented. The record indicates Juana supplied at least one name of an individual who was documented, but the record does not indicate that DHHS considered that individual for placement. It is also unclear whether Juana understood that if she had provided the names of other documented relatives, DHHS would have been required to prioritize placement with them over agency based foster parents.[1] Regardless, the children were placed with agency based foster parents.

The foster parents were particularly chosen because the foster mother could speak Spanish. DHHS believed that she would thus help the children maintain the ability to communicate with Juana, who herself had learned some Spanish. All

---

[1] See *In re Interest of Karlie D.*, 283 Neb. 581, 811 N.W.2d 214 (2012). See, also, Neb. Rev. Stat. § 43-246(5) (Cum. Supp. 2020); Neb. Rev. Stat. § 43-533(4) (Reissue 2016).

reports indicate that the foster parents generally provided good care for the children. However, the foster mother did not speak Spanish with the children. According to the foster mother, this was because the children did not want to speak Spanish. As a result, the children were soon able to speak and understand only English.

Due in part to the language barrier that quickly developed, and due to the lack of contact that Juana was afforded with her children, communication between Juana and her children faltered. For approximately the next 10 months, Juana was held in the Madison County jail awaiting resolution of the violation of custody charge. During this time, she was allowed no in-person visits with her children and few phone calls. Only noncontact visits separated by a glass window were allowed under the jail's policy, and despite Juana's requests for such visits, DHHS social workers stated they "d[id] not like to do that, especially with babies." Accepting that rationale, the juvenile court stated multiple times that due to Juana's incarceration, reasonable efforts toward visitation that might otherwise be put in place were not available. The children's permanency goal remained reunification with Juana.

Because of concerns about Juana's competency to stand trial on the violation of custody charge, she was transferred to the Lincoln Regional Center, a psychiatric hospital, for evaluation. There, Juana was found not to have innate cognitive delays or mental illness. It was determined that she instead suffered from a lack of basic understanding about the court process, likely due to differences in culture, language, and education. After approximately 4 months of treatment, Juana was deemed restored to competence.

Although the Lincoln Regional Center did not limit visitation during those 4 months, visits there between Juana and her children proved a point of contention between the parties. Upon arrival, Juana promptly moved for visitation that was then resisted by the State; the children's new guardian ad litem, who had been appointed to replace the initial one; and

the foster parents. Nevertheless, the juvenile court ordered that Juana be allowed to visit the children:

> I understand that there's a policy that [DHHS] doesn't like to bring children into the jail to have noncontact visits or to visit their parents through a glass screen, but at this point in time there is now an offer by the Lincoln Regional Center to provide a supervised in-person visit, and to not consider that I think would be to indicate that we have no intention of providing any reunification efforts toward this family.

Still, during her time at the Lincoln Regional Center, Juana was permitted only three in-person visits with the children. The children's permanency plan during this time was changed to concurrent goals of reunification and adoption.

Juana was next returned to the Madison County jail. She remained there for 1 month, again without any in-person visits with the children. The State and the new guardian ad litem for the children renewed their resistance to any in-person visits, with the State arguing, "They're a maximum half an hour. It's through the glass. It — and I think only one child can be present at a time. I am not quite certain. That's my understanding. So it — [DHHS] opposes any visits in jail given the nature of the its noncontact."

Juana's violation of custody charge was ultimately resolved pursuant to a plea deal. In exchange for the State's reducing the felony charge to a misdemeanor, Juana agreed to plead guilty. She was sentenced to time served and discharged from Madison County's custody. However, due to the hold placed on her by ICE, she was transported from jail to an ICE detention facility in Grand Island, where she remained for 2 months, still without visitations. She was finally released from ICE detention in February 2020, during the trial in this case.

## Petition to Terminate Parental Rights

In September 2019, with the fathers' parental rights already terminated, the State filed a petition to terminate Juana's

parental rights. The petition alleged four bases for terminating Juana's parental rights under Neb. Rev. Stat. § 43-292 (Reissue 2016).

Trial on the State's petition was held over 7 days from February to July 2020. During trial, the juvenile court heard testimony from approximately 40 witnesses and received almost 80 exhibits. Most of the State's evidence concerned the procedural history discussed above, with social workers and police recounting the proven instance of neglect, Juana's criminal conduct that led to her incarceration and detention, and the children's ensuing out-of-home placement in foster care.

Juana then provided her own account of the above events. According to her testimony, she had grown up in a poor Guatemalan community. Pregnant at age 12, she had been abandoned by her then-boyfriend 2 months into her pregnancy. He had immigrated to the United States, leaving her with his family. They had "treated [her] like a slave" and had even attempted to steal Mateo from her once he was born. She had fought to keep Mateo; to protect him, she had run away and begun living in a nearby town with her grandmother, who could watch Mateo while she worked.

Juana stated that one day while she was walking to work from her grandmother's house, she had been attacked and raped. Her attacker had threatened to kill her family if she reported anything to police, and she had known that even if she reported what had happened, local police would unlikely take action to help her. Then, on a second occasion, the same attacker had raped her again, and this time, she had become pregnant as a result. Upon the birth of her second child, Pedro, she had realized the need to escape Guatemala to make a better, safer life for her children. Accordingly, at age 16, she had made the dangerous trip north through Mexico and had hired a "coyote" to smuggle her and her children across the border into Texas.

Soon after reaching American soil, Juana and the children had been apprehended by ICE agents, Juana explained. ICE

apparently had given her a notice to appear in court, but she had not understood the notice. Instead, with money sent by her parents, she had bought tickets and, with the children, had boarded a bus to Norfolk, where her parents were living.

Juana said that after arriving in Norfolk, she had begun dating Carlos. He had initially been kind to her and her children, but he had changed after they had moved in with him. A heavy drinker, he would physically and sexually abuse Juana and physically abuse her children. According to Juana, he would "hit me on the nose," "pull me by my hair," "grab me by my throat," "hit me in the back [and] on my back with an electric[al] cord," "hit my children," and "take [the children] to the bathroom and put them in cold water" before throwing them outside into the snow and then "beat[ing] them a lot."

Juana had become pregnant with Bryan, she said, but Carlos had demanded that she not disclose to anyone that the baby was his. He had ordered Juana to refer to him as her "cousin" and had said that if she told anyone about his abuse, he would hurt her and the children. When Carlos went to work, he would typically lock Juana and the children inside a room. He would only allow her to have what she termed a "dumb phone," meaning that it could not access the internet and allow her to contact relatives for help.

According to Juana, one day after she had attended a prenatal appointment, Carlos had raped her. She had warned him of her doctor's urging to abstain from sex at this stage of pregnancy, but Carlos, saying that he did not care what the doctor said, had forced himself upon her. As a result of being raped, Juana had gone into premature labor and had given birth to Bryan in her house before an ambulance could arrive to bring her to a hospital.

Juana explained that the basis for her children's initial adjudication—that she had neglected them by leaving them at home unsupervised—had not been due to her choice. She had scheduled a ride to Bryan's doctor's appointment and had been readying the children to go with her. But Carlos, apparently

in a hurry, had pulled Juana's hair and pushed her, insisting that they would be late. He had urged her to leave Mateo and Pedro in the house alone, watching television. Even though Juana had protested, he had threatened her and had ordered her to do as he said. It was that incident, prompted by Carlos' coercion, that had led to the neglect charge and had resulted in the children's adjudication.

Juana also elaborated on what she had previously reported regarding her relocation to Minnesota. She said she had been driven to escape upon witnessing Carlos, without provocation, hurl a toy at Mateo's head. After tending to Mateo's injury, she had taken Carlos' "smartphone" and, using its internet connection, had contacted her cousin in Willmar, asking him to help her and the children flee from Carlos. The cousin had done so, and she and the children had arrived in Willmar where she had gained employment at a turkey processing facility. She had been proud of that job because it had allowed her to provide for her children. She said that she hoped to provide for them in the future, too.

Juana acknowledged having lied to social workers about where she had gone, but she said that she had done so out of fear that Carlos might find where she and the children were living. Despite conceding that she had made certain mistakes, Juana concluded by stating that since Mateo's birth, all of her actions had been motivated by her desire to protect her children and make a better life for them.

By the time Juana testified at the end of trial, she had been discharged from jail and from ICE detention. Her immigration attorney testified that based on her narrative of the above events, Juana had recently appeared before an immigration judge and had been granted asylum to remain in the United States. Her deportation proceedings were ended, and she would soon be granted legal authorization to work in the United States. She would also soon be eligible for lawful permanent resident status. Several other witnesses for Juana also emphasized that she was stable, living in a safe home with

one of the service providers she had first met upon her arrival in Norfolk, and that she was eager to deepen her bonds with her children.

Some of the facts alleged in Juana's testimony were disputed by the State. For example, while at least one witness remembered seeing the lock on Juana's bedroom door that Carlos had allegedly used to keep her and the children in the room, several other witnesses stated they did not remember seeing any such lock. The State used this testimony to question whether Juana and the children had, in fact, been locked in the room by Carlos and deprived of the ability to seek help or contact police. The State also suggested that Juana's allegations of rape and abuse were false and nothing more than convenient vehicles to obtain leniency in her criminal and immigration cases. However, most of Juana's testimony went undisputed.

### Order Dismissing Petition to Terminate Parental Rights

After hearing the above evidence, the juvenile court issued an order denying termination. The order began by summarizing the relevant facts, including those stated in Juana's testimony. Based on its observation of Juana on the stand, the juvenile court found her testimony highly credible:

> Her testimony has not been controverted in any major way. The County Attorney has attempted to impeach her testimony by questioning the reasonableness of it. She was impeached as to prior statements she had made to the service providers concerning where her parents lived at the outset of the case, and what Carlos' relation to her family was, and the identity of the fathers of her children. Those inconsistencies are concerning. . . .
>
> . . . While there have been some inconsistent statements made to others, the court finds Juana to be a credible witness when she described her life both in Guatemala and in Norfolk. I watched her imperceptible head jerk when she testified that Carlos grabbed her by her hair when he was angry. The testimony that he locked her in the

room in the first house is supported by the fact that locks were observed on the outside of the door.

Then, upon addressing each of the four statutory bases for termination alleged in the State's petition, the juvenile court concluded that each was unfounded. It also found that the State had failed to show that termination was in the children's best interests. The juvenile court thus dismissed the State's petition to terminate and ordered the children's permanency plan amended so that reunification with Juana would be the children's sole permanency goal, with "robust reunification efforts" being made. Visitation was ordered to begin within 2 weeks.

The State timely appealed, and the children's guardian ad litem filed a cross-appeal, joining the State's arguments in support of termination. On the guardian ad litem's motion, we moved this appeal to our docket.

## ASSIGNMENTS OF ERROR

At issue in this appeal is whether Juana's parental rights should be terminated. The State assigns, restated, that the juvenile court erred in denying the State's petition to terminate. The guardian ad litem on cross-appeal joins the State's assignment of error and further assigns, restated, that the juvenile court erred in finding the mother's testimony credible.

## STANDARD OF REVIEW

[1,2] We begin by setting forth the legal backdrop for this case. An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below.[2] However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another.[3]

---

[2] See *In re Interest of Prince R.*, 308 Neb. 415, 954 N.W.2d 294 (2021).

[3] See *id.*

## ANALYSIS

[3,4] In Nebraska, the grounds for terminating parental rights are codified in § 43-292. That statute contains 11 separate subsections, any one of which can serve as a basis for termination when coupled with evidence that termination is in the best interests of the child.[4] It is the State's burden to show by clear and convincing evidence both that one of the statutory bases enumerated in § 43-292 exists and that termination is in the child's best interests.[5]

### Statutory Basis for Termination

We turn to the statutory bases alleged here. In its petition, the State sought to terminate Juana's parental rights under § 43-292(2), (3), (6), and (7). The juvenile court, however, found all four unavailing. For the reasons set forth below, we find that the State met its burden with respect to § 43-292(7).

Section 43-292(7) allows for termination when "[t]he juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months." The juvenile court, despite acknowledging that "[o]n its face, the State certainly prevails on this allegation," concluded that the § 43-292(7) criteria were unsatisfied because of two "exceptions" to the statute. First, the juvenile court found that it was improper under Neb. Rev. Stat. § 43-292.02(2)(b) (Cum. Supp. 2020) for Juana's term of incarceration to be "the sole factual basis" for the 15 months' out-of-home placement. And second, the juvenile court reasoned, since DHHS had failed to make reasonable efforts to reunify, termination was forbidden by § 43-292.02(3)(c). We disagree with both rationales.

[5-7] While we obviously consider other factors during our assessment of the child's best interests,[6] we are not free to

---

[4] See, § 43-292; *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020).

[5] See *In re Interest of Leyton C. & Landyn C., supra* note 4.

[6] See, *In re Interest of Kendra M. et al.*, 283 Neb. 1014, 814 N.W.2d 747 (2012); *In re Interest of Angelica L. & Daniel L.*, 277 Neb. 984, 767 N.W.2d 74 (2009).

do so during our analysis under § 43-292(7). That is because statutory language is to be read according to its plain and ordinary meaning.[7] And by the plain and ordinary meaning of the language in § 43-292(7), there are no exceptions to the condition of 15 out of 22 months' out-of-home placement. That period of time was set by the Legislature as a guideline for what would be a reasonable time for parents to rehabilitate themselves to a minimum degree of fitness.[8] Accordingly, we have said that "[§] 43-292(7) operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent."[9] In other words, if the 15-out-of-22 formula is met, § 43-292(7) is met.

In this case, the children were placed out of Juana's home when she was arrested in May 2018. They remained in out-of-home placement with foster parents through at least May 2020, when trial ended. That period easily satisfies the 15-out-of-22 formula.

[8] The supposed "exceptions" to § 43-292(7) relied on by the juvenile court do not alter application of this formula. It is true, as the juvenile court noted, that § 43-292.02(2)(b) prohibits incarceration from being relied upon as "the sole factual basis" for termination.[10] But where, as here, termination is grounded in § 43-292(7), incarceration is not being relied upon as "the sole factual basis"; instead, the children's out-of-home placement is being relied upon. Out-of-home

---

[7] See *Wayne L. Ryan Revocable Trust v. Ryan*, 308 Neb. 851, 957 N.W.2d 481 (2021).

[8] See, *In re Interest of Leyton C. & Landyn C., supra* note 4; *In re Interest of Nicole M.*, 287 Neb. 685, 844 N.W.2d 65 (2014).

[9] *In re Interest of Aaron D.*, 269 Neb. 249, 260, 691 N.W.2d 164, 173 (2005). Accord *In re Interest of Justin H. et al.*, 18 Neb. App. 718, 791 N.W.2d 765 (2010).

[10] See, *In re Adoption of Micah H.*, 301 Neb. 437, 918 N.W.2d 834 (2018); *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015); *In re Interest of Zanaya W. et al.*, 291 Neb. 20, 863 N.W.2d 803 (2015).

placement is itself defined by the Legislature as an independent ground for termination, since "[c]hildren cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity."[11] The juvenile court's reliance on § 43-292.02(2)(b) in this case as an exception to § 43-292(7) is therefore misplaced.

The juvenile court's reliance on § 43-292.02(3)(c) fares no better. While § 43-292.02(1) mandates that a petition to terminate "shall be filed" by the State if certain conditions are met, § 43-292.02(3)(c) tempers that mandate. It clarifies that the State "is not required" to file such a petition "if . . . [t]he family of the juvenile has not had a reasonable opportunity to avail themselves of the services deemed necessary in the case plan or permanency plan approved by the court if reasonable efforts to preserve and reunify the family are required under section 43-283.01."[12]

[9] Contrary to the juvenile court's interpretation, however, that clarifying language does not prohibit the State from filing a petition to terminate. Rather, § 43-292.02(3) states only that when a family has not been provided a reasonable opportunity for reunification, the State "is not required" to seek termination. In a similar context, we have stated that "reasonable efforts to reunify a family are required under the juvenile code *only* when termination is sought under § 43-292(6)."[13] It would not offend § 43-292.02(3)(c) that the State moved to terminate under § 43-292(7), even assuming arguendo that DHHS had not made reasonable efforts to reunify Juana and the children.

---

[11] *In re Interest of Alec S.*, 294 Neb. 784, 797-98, 884 N.W.2d 701, 709 (2016). Accord, *In re Interest of Jahon S.*, *supra* note 10; *In re Interest of Nicole M., supra* note 8.

[12] § 43-292.02(3)(c).

[13] *In re Interest of Hope L. et al.*, 278 Neb. 869, 891, 775 N.W.2d 384, 400 (2009) (emphasis supplied), citing *In re Interest of DeWayne G. & Devon G.*, 263 Neb. 43, 638 N.W.2d 510 (2002). Accord *In re Interest of Ky'Ari J.*, 29 Neb. App. 124, 952 N.W.2d 715 (2020).

The juvenile court's analysis under § 43-292(7) was therefore in error. The State has shown clearly and convincingly that there exists a statutory basis for termination in this case. And since any one of the bases for termination codified in § 43-292 can serve as the basis for termination, we need not consider the sufficiency of the evidence concerning the State's other statutory bases for termination.[14]

## Best Interests of Child

We next consider whether termination is in the children's best interests. In light of Juana's circumstances, her relationship with her children, and her consistent efforts to reunify with them, we conclude on our de novo review that it is not.

[10,11] Under § 43-292, it is the State's burden by clear and convincing evidence to show that there not only exists a statutory basis for termination but that termination is in the best interests of the child.[15] Whereas statutory grounds are based on a parent's past conduct, the best interests inquiry focuses on the future well-being of the child.[16] This second hurdle is a high one for the State, since a parent's right to raise his or her children is constitutionally protected.[17] As we have stated before, "the Due Process Clause of the U.S. Constitution would be offended '"[i]f a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness . . . ."'"[18]

[12,13] As such, we apply a rebuttable presumption that it is in the child's best interests to maintain a relationship with

---

[14] See, *In re Interest of Leyton C. & Landyn C., supra* note 4; *In re Interest of Noah C.*, 306 Neb. 359, 945 N.W.2d 143 (2020).

[15] See *In re Interest of Leyton C. & Landyn C., supra* note 4.

[16] See *Kenneth C. v. Lacie H.*, 286 Neb. 799, 839 N.W.2d 305 (2013).

[17] See *In re Interest of Leyton C. & Landyn C., supra* note 4.

[18] *In re Interest of Xavier H.*, 274 Neb. 331, 348, 740 N.W.2d 13, 24 (2007), quoting *Quilloin v. Walcott*, 434 U.S. 246, 98 S. Ct. 549, 54 L. Ed. 2d 511 (1978).

his or her parent.[19] That presumption can only be overcome by a showing that the parent is either unfit to perform the duties imposed by the relationship or has forfeited that right.[20] Here, because Juana has consistently fought any attempts to terminate her relationship with her children, the question is whether she is unfit to perform her duties as a parent.

[14-16] Although the term "unfitness" is not expressly stated in § 43-292, we have said that it derives from the fault and neglect subsections of that statute and from an assessment of the child's best interests.[21] In this context, parental unfitness means a personal deficiency or incapacity that has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and that has caused, or probably will result in, detriment to a child's well-being.[22] The best interests and parental unfitness analyses require separate, fact-intensive inquiries, but each examines essentially the same underlying facts.[23]

Upon its analysis of those facts, the juvenile court found that the State had "not prove[d] that Juana is an unfit parent. While she may have some intense work to do, it appears she has the ability and willingness to so rehabilitate herself if she is provided with the rehabilitation tools generally provided to parents." The juvenile court thus concluded that termination is not in the best interests of the children. We agree.

The State's involvement in this case began when police discovered that Juana had left two of her children, then ages 2 and 4, unsupervised at home. At the adjudication hearing in 2017, Juana admitted to having neglected her children on that one occasion, but no more, and neither the State nor guardian

[19] See *In re Interest of Leyton C. & Landyn C., supra* note 4.

[20] See *id.*

[21] See, *In re Interest of Nicole M., supra* note 8; *In re Interest of Ky'Ari J., supra* note 13.

[22] See *In re Interest of Leyton C. & Landyn C., supra* note 4.

[23] See *id.*

ad litem objected to the juvenile court's acceptance of that limited admission.

The State now alleges that prior to that hearing, Juana had "repeatedly" left the children unsupervised at home while she went to appointments.[24] But that allegation was not factually supported at the adjudication hearing in 2017. And if indeed the State had believed that Juana was making a practice of leaving her children unsupervised at home and that such conduct warranted termination, the State could have moved to terminate Juana's parental rights at the hearing. It did not. The State did not even deem the circumstances dire enough to necessitate the children's out-of-home placement. We are thus left with evidence of only one instance of Juana's leaving her children unsupervised at home. This does not amount to parental unfitness warranting termination.

The State and guardian ad litem also direct us to other evidence of neglect in our record. They cite Juana's failure to expediently meet her children's health needs. They also cite the 21 months she spent in jail and immigration detention away from her children. We are not persuaded that our record reveals unfitness regarding either issue.

In *In re Interest of Angelica L. & Daniel L.*,[25] we characterized an immigrant mother's arrest and failure to expediently seek attention for her children's medical needs as "obvious mistakes" in judgment. Yet, we still held that those mistakes were "insufficient lapses to establish her unfitness to parent."[26] After all, "the law does not require the perfection of a parent."[27] In assessing her fitness, we considered such

---

[24] Brief for appellant at 26.

[25] *In re Interest of Angelica L. & Daniel L., supra* note 6, 277 Neb. at 1008, 767 N.W.2d at 93.

[26] *Id.*

[27] *Id.* at 1007, 767 N.W.2d at 93, citing *In re Interest of Xavier H., supra* note 18, and *In re Interest of Aaron D., supra* note 9. Accord *In re Interest of Leyton C. & Landyn C., supra* note 4.

factors as the gravity of lapses in her judgment, the sincerity of those lapses, her willingness to learn about how to avoid similar mistakes in the future, and whether she appeared likely to recidivate.[28]

Applying those factors here, we acknowledge that, for reasons not clearly available in the record, Juana was slow to seek medical treatment for her children. As a result, the children faced medical issues, including Bryan's "flat head," Mateo's dental problems, and all three children's bedbugs and scabies. And those issues needed attention. We have found in other cases that a parent's failure to seek appropriate medical care for a child, under certain circumstances, demonstrated parental unfitness.[29]

But unlike in those other cases, where, for example, parents had actively disconnected their child's feeding tube to the point that he entered a starvation state,[30] Juana's lapses in judgment were not the result of apathy toward her children or selfishness. To the contrary, our record suggests that she was sincere in wanting the best for her children. As a DHHS social worker acknowledged, "[Juana] didn't understand" much of the English language, how to use U.S. money, or that the medical treatment the children needed was available in Norfolk. And her lack of comprehension was only compounded by Carlos' coercion, which frustrated her ability to reach out for help. Still, Juana did, when possible, seek and accept help, including from DHHS social workers, and even before their involvement, from various service providers. With their help, Juana scheduled appointments for her children and was regularly attending appointments until she and the children left for Minnesota. In contrast to cases in which we have found a

---

[28] See, *In re Interest of Angelica L. & Daniel L., supra* note 6; *In re Interest of Elijah P. et al.*, 24 Neb. App. 521, 891 N.W.2d 330 (2017).

[29] See, e.g., *In re Interest of Hope L. et al., supra* note 13; *In re Interest of J.B. and A.P.*, 235 Neb. 74, 453 N.W.2d 477 (1990).

[30] See, e.g., *In re Interest of Hope L. et al., supra* note 13.

parent responsible for allowing a child to remain in an abusive situation,[31] Juana claimed that her relocation to Minnesota was for the purpose of removing her children from Carlos' abuse. The trial court credited Juana's testimony on this point, and the State has provided no compelling reason for us not to do the same.

In addition, the State does not allege that the children's medical issues will continue to seriously affect the children in the future. While the bedbugs and scabies were apparently severe, the record indicates that Juana tried to remedy the problem by moving with her children to a different house and discarding household items that she believed were dirty and infested. Those efforts were met "with some, but not complete success," the juvenile court found. And the issues with Bryan's "flat head" appear to have been resolved. Even Mateo's dental issues, the longest-lasting medical problem faced by any of the children, have been remedied by a surgery to remove two teeth and place "caps" on numerous others. It is true that this procedure was performed while Mateo was in the care of the foster parents, not Juana; nevertheless, the fact that his dental issues could be remedied by one relatively common procedure suggests to us that the issues were not so severe that they will affect him throughout his life. Thus, as we said in *In re Interest of Angelica L. & Daniel L.*, "[w]hile we recognize and express concern over [this mother's] medical judgment, we disagree that such error in judgment warranted termination of her parental rights."[32]

We recognize also that Juana's actions that led to her arrest, incarceration, and detention were wrong. She entered the United States illegally, failed to appear for her hearing before an immigration judge, violated a custody order, and used falsified documentation to obtain a job. Each of those

---

[31] See, e.g., *In re Interest of J.B. and A.P., supra* note 29.

[32] *In re Interest of Angelica L. & Daniel L., supra* note 6, 277 Neb. at 1007, 767 N.W.2d at 93.

actions was voluntary and in violation of the law. As the State observes, such actions may be considered in a termination proceeding, insofar as they reflect on the child's best interests and parental fitness.[33] In considering a parent's arrest and incarceration in this way, we generally take note of the nature of the crimes committed, as well as the parent's conduct before and during incarceration.[34]

In this case, our assessment of Juana's criminal conduct depends on how much credence we give Juana's testimony. The guardian ad litem contests the veracity of Juana's narrative in whole based on discrepancies in her testimony regarding her and her children's dates of birth, her destination when she left Norfolk, and whether she was, in fact, repeatedly raped and abused.

However, the guardian ad litem fails to show that these minor discrepancies undermine the whole of Juana's testimony, which, as noted above, went largely undisputed at trial. Moreover, the juvenile court, having observed Juana's testimony, found her to have been a "credible witness when she described her life both in Guatemala and in Norfolk." On our de novo review, we give weight to that finding and thus to Juana's testimony.[35]

According to Juana's testimony, she was 16 years old, a juvenile herself, when she crossed the U.S. border illegally, hoping to make a better, safer life for her children. She said that her failure to appear for immigration court was because she did not understand the notice to appear. After some time spent in Norfolk, where she said that she and her children were abused, they fled to Minnesota. She was arrested there for forgery and using false identification. According to Juana's testimony, both charges were the result of her desire to obtain work to support her children.

---

[33] See, *In re Adoption of Micah H., supra* note 10; *In re Interest of Jahon S., supra* note 10.

[34] See, e.g., *In re Adoption of Micah H., supra* note 10.

[35] See *In re Interest of Prince R., supra* note 2.

In considering Juana's offenses against the context she provided by her testimony, we do not diminish the seriousness of her actions. We merely note that those actions do not reflect the likelihood of future criminality so much as they signal her reasonably held belief that at the time, she had no good options. We are also encouraged that Juana has now served her time for those offenses and is in a safe living situation with one of her previous service providers. She has been granted asylum to stay in the country legally and is on a path toward working legally and contributing to society. As we said before, "we do not conclude that [this immigrant mother's] attempt to bring herself and her child[ren] into the United States, in the belief that they would have a better life here, shows an appreciable absence of care, concern, or judgment."[36]

The State argues that this case is distinguishable from *In re Interest of Angelica L. & Daniel L.*,[37] because, unlike in that case, "criminal charges were [actually] pursued" against Juana.[38] But the State fails to support that distinction with an explanation as to its import. To the extent the State implies that Juana's offenses were more serious, we counter by observing that the result of her offenses is far less consequential to the analysis we must perform. Because at this stage of inquiry we are concerned with the future well-being of the children, the result of Juana's offenses is highly relevant here.[39] Whereas in *In re Interest of Angelica L. & Daniel L.*, the mother's charge resulted in her deportation, Juana has been granted asylum and will soon have authorization to work.[40] Therefore, while she was alleged to have committed more offenses than the

---

[36] *In re Interest of Angelica L. & Daniel L., supra* note 6, 277 Neb. at 1007, 767 N.W.2d at 93.

[37] *Id*.

[38] Brief for appellant at 39.

[39] *Kenneth C. v. Lacie H., supra* note 16.

[40] See *In re Interest of Angelica L. & Daniel L., supra* note 6.

mother in *In re Interest of Angelica L. & Daniel L.*, Juana's charges have less bearing on her future fitness as a mother.[41] In other words, as noted below, Juana is now here in Nebraska with support services available for any parental shortcomings she may have. Her lengthy stay in jail and detention was at least partially due to her vigorous defense of her right to remain in this country with her children, and we do not fault her for the vigor of that defense. While Juana's criminal offenses were serious, they appear to be behind her and do not overcome our constitutionally informed presumption of parental fitness.

[17,18] We are left to consider the children's out-of-home placement that resulted from Juana's arrest, incarceration, and detention. As noted above, the State has shown clearly and convincingly that the children's period of out-of-home placement meets the statutory basis for termination under § 43-292(7). Yet, while § 43-292(7) generally "'serves the purpose of providing a reasonable timetable for parents to rehabilitate themselves,'"[42] we have observed that

> "termination based on the ground that a child has been in out-of-home placement for 15 of the past preceding 22 months is not in a child's best interests when the record demonstrates that a parent is making efforts toward reunification and has not been given a sufficient opportunity for compliance with a reunification plan."[43]

Here, despite the children's out-of-home placement, the record indicates that Juana has made progress as a parent. The juvenile court went so far as to say that "enormous strides have been made" by Juana. No longer is she incarcerated. No longer is she in an abusive relationship. No longer is she at risk of deportation. Instead, she has been granted asylum and

---

[41] See *id.*

[42] *In re Interest of Aaron D., supra* note 9, 269 Neb. at 261, 691 N.W.2d at 173, quoting *In re Interest of Mainor T. & Estela T.*, 267 Neb. 232, 674 N.W.2d 442 (2004).

[43] *Id.* Accord *In re Interest of Alec S., supra* note 11.

is living in a secure home with a friend, who is a positive influence and is teaching her English and any previously lacking parenting skills.

[19] Parental obligation requires a continuing interest in the children and a genuine effort to maintain communication and association with the children.[44] Since her children's out-of-home placement, Juana has taken every opportunity afforded her to reengage face-to-face and to speak with them. This is not a case of "[]last-minute attempts by [a] parent[] to comply with the rehabilitation plan . . . ."[45] While her interactions may have not always been meaningful, that has not been for a lack of her continuing interest or genuine effort.

And moreover, the State has failed to show that Juana is any longer leaving her children unsupervised. Nor has the State shown any evidence of a condition, such as addiction,[46] that is likely to remain with Juana and continuously affect her ability to parent. The State has not shown that absent termination, the children will likely be "suspended in foster care or . . . made to await uncertain parental maturity."[47]

[20] We are aware that the children have been well cared for by the foster parents. But that "the foster parents in this country might provide a higher standard of living does not defeat [the parent's] right" to maintain the constitutionally protected relationship with his or her child.[48] Indeed, our best interests analysis is centered on a premise that absent parental unfitness, preserving the relationship between a parent and

---

[44] *In re Interest of Isabel P. et al.*, 293 Neb. 62, 875 N.W.2d 848 (2016).

[45] See *In re Interest of Alec S., supra* note 11, 294 Neb. at 796, 884 N.W.2d at 709.

[46] See, e.g., *In re Interest of Leyton C. & Landyn C.*, *supra* note 4.

[47] *In re Interest of Alec S.*, *supra* note 11, 294 Neb. at 797-98, 884 N.W.2d at 709. Accord, *In re Interest of Jahon S., supra* note 10; *In re Interest of Nicole M., supra* note 8.

[48] *In re Interest of Angelica L. & Daniel L., supra* note 6, 277 Neb. at 1012, 767 N.W.2d at 96.

child will be in the child's best interests.[49] We are expressly forbidden by statute from considering the foster parents' fitness in that assessment. Under § 43-292.02, the foster parents' fitness and willingness to adopt "shall have no bearing on whether parental rights shall be terminated."[50]

Accordingly, while we commend the foster parents for their care of Juana's children, we are not swayed from our conclusion that the State has failed to meet its heavy burden of clearly and convincingly proving her unfitness as a mother. Termination of her parental rights is not in her children's best interests.

## CONCLUSION

We affirm the juvenile court's order dismissing the State's petition to terminate Juana's parental rights.

Affirmed.

---

[49] See, *In re Interest of Leyton C. & Landyn C., supra* note 4; *In re Interest of Noah C., supra* note 14.

[50] See § 43-292.02(2).

Heavican, C.J., concurring.

I concur with the majority's opinion affirming the juvenile court's denial of the State's petition to terminate Juana's parental rights. As the opinion notes, the State alleged four statutory bases for termination and proved the mathematical formula of Neb. Rev. Stat. § 43-292(7) (Reissue 2016). As such, it was not necessary for the majority to reach the State's other statutory bases alleged for termination. I write separately, however, to discuss one of them and to express my concern over the failings of the Department of Health and Human Services (DHHS) in this case.

One of the State's bases for termination, § 43-292(6), allows for termination when, "[f]ollowing a determination that the juvenile is one as described in subdivision (3)(a) of section 43-247, reasonable efforts to preserve and reunify the family if required under section 43-283.01, under the direction of

the court, have failed to correct the conditions leading to the determination."

Due to the children's adjudication in 2017 for the instance of neglect, it is undisputed that at all times relevant to this appeal, Juana's children were subject to Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) and DHHS was required to provide "reasonable efforts . . . to preserve and reunify the family" under Neb. Rev. Stat. § 43-283.01 (Cum. Supp. 2020). Accordingly, to meet its burden for termination under § 43-292(6), the State needed to prove, by clear and convincing evidence, that DHHS had provided such efforts and that such efforts had failed to correct the conditions that had led to the children's 2017 adjudication.[1]

Contrary to the State's assertion in its petition, however, the juvenile court found that DHHS had not provided reasonable efforts to reunify Juana with her children. The court distinguished between the time before and after the children's out-of-home placement. Before out-of-home placement, the court acknowledged that through in-home services and the like, DHHS' efforts had been reasonable in trying to prevent the children's removal from Juana's home. But after the children's removal, the court found that DHHS' efforts to reunify had been "insufficient or non-existent." I agree that DHHS' efforts to reunify were insufficient.

The children's out-of-home placement began in May 2018, when Juana was arrested and her children were taken into temporary foster care. From that time until June 2018, Juana remained in the custody of Willmar police. She then spent 10 months in the Madison County jail, 4 months at the Lincoln Regional Center, another month at the Madison County jail, and finally 4 months in a U.S. Immigration and Customs Enforcement (ICE) detention facility. At the beginning of trial, Juana had been held, with her children in foster care, for

---

[1] See *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020).

a total of 21 months. Reasonable efforts to reunify the family were required throughout those 21 months,[2] yet DHHS provided Juana only three in-person visits with her children and minimal other meaningful contact, due in no small part to DHHS' failure to encourage the children to maintain a common language and culture with their mother.

As an initial matter, I note that the best thing DHHS could have done at the start of out-of-home placement would likely have been to place the children with Juana's relatives. Our record evidence indicates that Juana had relatives in the United States, including her parents. The children's placement with them might have eased many of the challenges of coordinating visits and contact between Juana and her children, and it would have allowed the children to maintain their understanding of the K'iche' language and of their mother's culture. Indeed, for these reasons among others, DHHS is required to prioritize placement with approved relatives over other foster parents.[3]

But DHHS apparently refused to place the children with undocumented family members. DHHS cites no specific policy or rule forbidding such placement, and I question that refusal, especially in cases like this one. Moreover, despite Juana's acknowledgment that many of her family members are undocumented, we have record evidence that she provided DHHS with the name of at least one relative who "has papers . . . so he's of some kind of legal status," yet our record does not indicate that DHHS followed up about placing the children with him. I emphasize that placement with a relative of Juana's could have aided Juana's reunification with her children, and DHHS' apparent reluctance to facilitate such placement is the first moment at which I question whether reasonable efforts to reunify were provided.

---

[2] See § 43-292(6).

[3] See *In re Interest of Karlie D.*, 283 Neb. 581, 811 N.W.2d 214 (2012). See, also, Neb. Rev. Stat. § 43-246(5) (Cum. Supp. 2020); Neb. Rev. Stat. § 43-533(4) (Reissue 2016).

Next, I question DHHS' resistance to visitation. At oral argument, Juana's attorney acknowledged that at several of the facilities in which Juana had been housed, there may not have been "anything else that [DHHS] could have done" regarding visitation. With the children already back in Nebraska, visitation was not practical while Juana was being held at the jail in Willmar. The ICE detention facility also did not allow visitation. The Madison County jail limited visitation to noncontact visits separated by a glass window. I note the juvenile court's statement that "[e]veryone agree[s] that visits through the glass at the jail would not be good for the children." Still, considering that Juana spent a total of 11 months at the Madison County jail, it is difficult to reconcile DHHS' resistance to any in-person visits with its requirement to provide reasonable efforts to reunify Juana and the children.

Sometimes accommodations must be made when such efforts would be reasonable for purposes of "mak[ing] it possible for a juvenile to safely return to the juvenile's home."[4] Here, considering the children's ages, a reasonable accommodation would have been a request for the juvenile court to order in-person visits in the Madison County jail without the use of a glass window. But DHHS, opposed to any in-person visitation, made no such request.

Even when Juana was housed for 4 months at the Lincoln Regional Center, a facility that would not have limited in-person contact, DHHS, the second guardian ad litem, and the foster parents all expressed hostility to any visits, even supervised ones. A social worker for DHHS speculated that since Juana might not remain at the Lincoln Regional Center for long before either being returned to the Madison County jail or turned over to ICE for deportation, it might make the children feel "abandon[ed]" if they met her once or twice but then no more. The foster mother expressed fear that it would be "confusing" for the children to visit their mother. The State

---

[4] See § 43-283.01(2).

ventured further, stating that "[i]t would seem more likely than not that this mother will be deported, and the opportunity to reunify her with her children seems very bleak."

By these statements, I am left with the impression that DHHS had prejudged Juana's parental fitness based on its uninformed prediction about her immigration status and that preparation was underway to discourage any further bonding between Juana and her children. But the State points to no statute under which reasonable efforts to reunify are excused when a mother's immigration status is uncertain. That is because there is none. To the contrary, Juana's permanency objective remained reunification with the children, and under § 43-283.01(7), even when reunification and adoption are concurrent permanency objectives, "priority shall be given to preserving and reunifying the family." That does not appear to have been done here. I thus find the above statements difficult to reconcile with DHHS' duty under § 43-283.01 to make reasonable efforts to reunify the family.

Even less reconcilable is DHHS' lack of efforts to find other methods of communication between Juana and her children. Given the children's ages at the beginning of their out-of-home placement, their initial guardian ad litem expressed alarm at the lack of meaningful contact between Juana and her children. Concerned that DHHS was "[i]mpeding/impairing mother's ability to communicate with the children," the guardian ad litem issued a report identifying some of the ways in which DHHS was not making reasonable efforts to reunify Juana with her children.

According to the report:

> I was advised that the only way for mother to contact the boys was by collect calls since she was moved, and the foster family was told either not to take the calls, or that they would not be re-imbursed. I question whether there can be reasonable efforts if contact is not being actively encouraged (and in fact, actually impaired), if the goal is indeed reunification.

. . . The children are very young and I fear they will soon lose [their] mother's native language which could impact their ability to communicate with their mother and/or other family members.

Yet, even as that report was highlighting DHHS' lack of reasonable efforts to reunify, DHHS was making few, if any, improvements to those efforts. DHHS instead proceeded to permit Juana to communicate with her children only by phone. And those calls grew strained for the very reasons flagged in the guardian ad litem's report. As indicated by the report, phone calls continued to be required to be dialed collect and charged to the foster parents, with the cost of those calls discouraging the foster parents from picking up. And because inadequate efforts were made to ensure that the children maintained an understanding of K'iche' or Spanish, the two languages in which they could have conversed with Juana, dialogue between Juana and her children continued to become less meaningful by the day.

An interpreter was sometimes provided during phone calls, but that occasional effort did not reverse the children's quickly closing opportunity to remain capable of themselves communicating with their mother. Not only did this weaken the children's bond with their mother, but it severed their connection to the culture into which they had been born. This court and others have recognized the value that children might find in remaining attached to their parents' cultural heritage.[5] Yet,

---

[5] See, e.g., *In re Guardianship of Eliza W.*, 304 Neb. 995, 1004, 938 N.W.2d 307, 314 (2020) (recognizing that both the federal Indian Child Welfare Act of 1978, 21 U.S.C. §§ 1901 to 1963 (2018), and the Nebraska Indian Child Welfare Act, Neb. Rev. Stat. §§ 43-1501 to 43-1517 (Reissue 2016), are guided by general policy of protecting Indian children from being removed from their families and being placed "in homes lacking an appreciation for Native American culture"). See, also, Christine P. Costantakos, Juvenile Court Law and Practice § 5:14 at 355 (2020) (noting that child's future well-being may be aided by "the juvenile's identification with his or her family and cultural heritage, and his or her ability to form and maintain relationships with extended family members, where appropriate").

in this case, it appears the children's mother—and her culture—were given short shrift by DHHS.

I recognize that DHHS social workers are often overburdened with caseloads and that their jobs are trying. But in my view, what was allowed to happen here is perplexing and unacceptable, given DHHS' duty under § 43-283.01. The foster parents were chosen because the foster mother spoke Spanish, and it was anticipated she could continue to speak that language with the children. But the foster mother's ability to speak Spanish proved unhelpful to the situation, because she stopped communicating with the children in Spanish soon after their placement in her home. According to her testimony, she stopped speaking Spanish with the children as soon as they expressed that they wished to speak English instead. While the foster mother may not herself have owed a duty under § 43-283.01 to speak Spanish with the children, it was DHHS' duty, when she declined to do so, to make reasonable efforts to protect communication and thus the bond between Juana and the children. DHHS did not meet that duty.

Consequently, just as would be expected, Juana's communication with the children deteriorated. According to DHHS social workers and the foster parents, Juana would phone at every opportunity provided to her. When she phoned the foster parents, they would ask the children whether they wished to speak with Juana. The children would often decline. That is hardly surprising considering their ages, that they had barely seen their mother since out-of-home placement, and that they could no longer communicate with her since their K'iche' and Spanish language abilities had been allowed to lapse. When the children declined to speak, there was no encouragement from the foster parents that the children should speak with their mother; nor were there followup evaluations from DHHS inquiring how to make the interaction more meaningful for Juana and her children.

To this point, the juvenile court noted that it had considered video entered into evidence of a typical phone call between Juana and her children:

The video was captured by the [guardian ad litem] who was present at the foster home to observe and record the visits. The Court notes that the video production starts with some wrestling and fun rough housing with the foster dad and the boys. Then, the foster mom comes into the room, looks at her watch or phone[,] and waits for the expected call from Juana (who never missed an opportunity to exercise the meager visitation opportunities she had). When the call came in, foster mom announced that the mom was on the phone. She took her phone into the dining room which adjoined the living room and laid it face up on the table and left to return to the children in the living room. The children, distracted by the fun play they were enjoying before the call, and maybe further by the presence of the [guardian ad litem] filming their behaviors, did not engage with the mother[,] and her "visitation" provided her the opportunity to stare only at the [foster parents'] ceiling. She called out to the children when she recognized a voice in the background. There was no family support worker, no engagement or encouragement by the foster parents or the [guardian ad litem]. Just 5 minutes of Juana, hoping to get a glimpse of her children and perhaps an opportunity to talk to them. If [that video] is truly characteristic of the effectiveness of the FaceTime visits, the court finds those efforts to be unreasonable, ineffective and token.

Further, as the juvenile court noted, beyond these phone calls, "[t]here were no services provided to the mother to maintain contact with the children." For example, even after a service provider recommended family therapy to address the traumatic effects of domestic violence, DHHS failed to provide therapy to either the children or Juana. I am again left with the impression that DHHS had prejudged Juana's fitness as a parent and that it was thus making no more than half-hearted efforts toward reunification. This was in violation of DHHS' duty under § 43-283.01. The State cannot now claim § 43-292(6) as a basis for terminating Juana's parental rights.

In arguing that DHHS' efforts were in fact reasonable, the State takes issue with the juvenile court's statement that "[i]n retrospect, this Court regrets the finding that reasonable efforts were being made [by DHHS]." According to the State, that language evinces a "misunderst[anding] [of] the meaning of reasonable efforts" and diminishes the juvenile court's own role in encouraging the reunification efforts that were provided.[6]

I disagree that the juvenile court's order evinced any misunderstanding about the nature of reasonable efforts. As described above, critical efforts were lacking to protect the bond between Juana and her children and to facilitate their reunification. Thus, if anyone evinced a misunderstanding of reasonable efforts, it was DHHS. Once again, I acknowledge the difficult job of a DHHS social worker. But that does not excuse noncompliance with § 43-283.01. DHHS is responsible for providing reasonable efforts under that statute, not the juvenile court or anyone else.

For the above reasons, I am persuaded that DHHS failed to provide reasonable efforts to reunify Juana with her children in this case. Although that fact was not necessary to the court's main opinion in this case, I write separately to express my concern and to implore DHHS to do better. Not only does § 43-283.01 require it, but the parents and children in this State deserve it.

Miller-Lerman, J., joins in this concurrence.

---

[6] Brief for appellant at 31.